## ESTATE OF HENRY H. KYLE, DECEASED, ARLAND L. WARD, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 654-88.    Filed June 11, 1990.

*David H. Evaul, Grady P. Dickens, C. Kent Adams, R. Brent Clifton, Todd Wallace,* and *Edwin R. DeYoung,* for the petitioner.

*James W. Lessis,* for the respondent.

COHEN, *Judge:* Respondent determined a deficiency of $5,614,480.15 in the Federal estate tax of the Estate of Henry H. Kyle, deceased, Arland L. Ward, executor. After concessions, the issues remaining for decision are (1) whether an estate tax marital deduction pursuant to section 2056 should be allowed for the surviving spouse's share of decedent's residual estate attributable to the surrender of homestead rights under State law; and (2) whether a deduction pursuant to section 2053(a)(3) should be allowed for a claim against decedent's estate.

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect as of

the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference.

## General Background

Henry H. Kyle (decedent) was born on May 30, 1923, and died in Los Angeles, California, on July 22, 1983, of gunshot wounds. Henry H. (Rick) Kyle, decedent's son, was subsequently convicted of involuntary manslaughter in connection with decedent's death.

In addition to Henry H. (Rick) Kyle, decedent was survived by two daughters, Paula Holtzclaw and Jackie L. Phillips, and one other son, Scott E. Kyle. Decedent was also survived by his fifth wife, Vicki Heng-Fan Yang. Decedent's surviving children were born during three of his four prior marriages. All of decedent's earlier marriages were terminated by divorce.

At the time of his death, decedent was a domiciliary of Texas. Decedent's homestead under Texas law was his residence located at 9909 Preston Road, Dallas, Texas (the Dallas homestead), valued at $1,182,090.

Decedent left a will dated June 13, 1978. The will left the bulk of decedent's estate to his two sons, made minor bequests to his two daughters, and named Arland L. Ward (Ward) executor. Ward was appointed independent executor of the estate on November 29, 1983. Ward resided in Mesquite, Texas, at the time the petition was filed. On October 22, 1984, Ward timely filed a Federal estate tax return.

## Marital Deduction

Decedent married Vicki Heng-Fan Yang (Mrs. Kyle) on November 8, 1982. As decedent's will predated that marriage, it made no mention of or provision for Mrs. Kyle. Mrs. Kyle was, however, the beneficiary of a $1 million insurance policy on decedent's life.

Ward filed an application to probate decedent's will on July 28, 1983, in the Probate Court of Dallas County, Texas (the Texas action). On August 15, 1983, Mrs. Kyle filed an opposition to the probate of decedent's will in the Texas action. In her opposition, Mrs. Kyle asserted that decedent had died a domiciliary of California rather than Texas and generally denied the authenticity and validity of the will. A trial date was set for the Texas action, and Ward was appointed temporary administrator pending trial.

Subsequently, Mrs. Kyle filed an application for temporary administration of decedent's estate in the Superior Court of the State of California for the County of Los Angeles (the California action). Ward entered his opposition to Mrs. Kyle's filing in the California action, denying the validity of decedent's marriage to Mrs. Kyle and requesting that he be appointed temporary administrator.

On September 6, 1983, the Probate Court of Dallas County, Texas, held a pretrial conference in which the court defined the issues in the case to be:

a. the domicile of decedent at his death;

b. the validity of decedent's will dated June 13, 1978, as well as the validity of its execution; and

c. such other issues as might be raised by the parties in their pleadings after discovery in the case was completed, including decedent's marital status.

The court set the matter for jury trial for December 12, 1983. Settlement negotiations, however, resulted in a compromise settlement agreement executed on November 23, 1983, by all parties to the probate proceedings.

The compromise settlement agreement was approved by the Probate Court on November 28, 1983. Under the terms of the compromise settlement agreement, the parties recognized Mrs. Kyle as decedent's surviving spouse and acknowledged that the will dated June 13, 1978, was decedent's last will and testament. As a result of decedent's death, Mrs. Kyle received or became entitled to receive three items:

a. the proceeds of a $1,000,000 insurance policy that named Mrs. Kyle as beneficiary;

b. cash payments of $60,000 as a spousal living allowance pursuant to section 286 of the Texas Probate Code; and

c. a 13.7355 percent share (the residual share) of decedent's net estate after payment of various specific bequests.

Decedent's "net estate" was described in the compromise settlement agreement as decedent's property "wherever situated, and in whatever form existing," (1) deleting the specific bequests and the conveyance of a condominium, (2) after payment of costs of administration, debts of the estate, successful claims of third parties, and certain taxes, and (3) excluding the assets of the Henry H. Kyle Family Trust.

The parties to the compromise settlement agreement were adverse parties with respect to the agreement itself and to the preceding litigation. Mrs. Kyle obtained a residual share of decedent's estate in exchange for foregoing various claims under Texas and California law. Of the 13.7355-percent share of decedent's net estate, 25 percent of Mrs. Kyle's residual share was in exchange for foregoing her claims under the Texas homestead law. The remaining 75 percent of Mrs. Kyle's residual share was in exchange for foregoing claims other than those under the Texas home-stead law.

On its Federal estate tax return, Form 706, "Elections by the Executor," petitioner answered "No" in response to the question "Do you elect to claim a marital deduction for an otherwise nondeductible interest under section 2056(b)(7)?"

On Schedule M, "Bequests, etc., to Surviving Spouse," of the estate tax return, petitioner claimed an estate tax marital deduction for property passing to a surviving spouse, as follows:

| | |
|---|---|
| 1. Life insurance proceeds | $1,000,000 |
| 2. Cash | 60,000 |
| 3. Distributive share | 448,848 |
| Total | 1,508,848 |

In the notice of deficiency, respondent disallowed the claimed deduction. The parties have agreed that the estate is entitled to a marital deduction for decedent's community share of the insurance policy. The parties have also agreed that the estate is not entitled to a deduction for the cash payments made as a spousal living allowance.

## Claim Against the Estate

In 1977, decedent formed Kyle Forge Co. (Kyle Forge-Texas), a Texas corporation. Kyle Forge-Texas was to manufacture parts to be sold to the Jetco companies, a group of companies in which decedent owned a majority interest. William D. Walden (Walden) was hired to construct the forge factory and to manage its operations after construction.

To provide space for the forge factory, Jetco, Inc. (Jetco), leased, with an option to purchase, land adjacent to its plant in Claremore, Oklahoma. Jetco then sublet this land to Kyle Forge-Texas.

Prior to March 1981, decedent suggested to Walden that Walden might purchase the forge operations. In response to Walden's protests that he could not afford to purchase Kyle Forge-Texas, decedent assured Walden that decedent would help Walden with financing.

In March 1981, Kyle Forge-Texas sold its assets to Walden. Documents related to the sale included a contract, an option to purchase, and a letter agreement. Decedent signed the contract and the option to purchase in his individual capacity and as president on behalf of Kyle Forge-Texas and Jetco. Decedent signed the letter agreement only in his capacity as president of Jetco.

After the sale, the forge factory was operated under the name Okie Forge Co., an Oklahoma corporation. Subsequently, Okie Forge Co. amended its articles of incorporation to change its name. Effective May 5, 1981, the forge plant operations continued under the name of Kyle Forge Co. (Kyle Forge-Oklahoma), an Oklahoma corporation.

To finance the purchase, Walden borrowed $613,000 from the Boulder Bank & Trust Co. of Tulsa, Oklahoma, of which $400,000 was paid directly to decedent. Pursuant to the contract for sale, Walden also executed a note payable to decedent for an additional $362,000. The contract for sale specified, in pertinent part, that:

2. Purchaser agrees that the capacity of this plant will be used first to supply forgings ordered by * * * [the Jetco companies], their assigns or affiliates, these orders taking precedent over any other customer * * *

*     *     *     *     *     *     *

4. Seller agrees * * * that if for any reason * * * [the Jetco companies], the seller, its assigns or affiliates become unwilling or unable to purchase forgings from [Kyle Forge-Oklahoma] at an amount equal to or greater than the average yearly purchase of the past with increase for inflation * * * [Kyle Forge-Oklahoma] will have the right to market the forgings * * * at will.

In the letter agreement between Walden and Jetco, Jetco granted Walden a license to manufacture various forgings for which Jetco owned patents. The letter agreement further specified that:

Jetco agrees to purchase a minimum of $20,000 each month from you or you are free to sell your production of these products to any third party. In the event Jetco purchases a minimum of $20,000 a month from you, you agree to provide these products exclusively to Jetco or its assigns.

It is understood and agreed this assignment to you is for the benefit of a corporation you will form to operate a forge plant located adjacent to Tulsa-Jetco in Claremore, Oklahoma.

As early as December 31, 1980, Walden knew that decedent was not the owner of the land underlying the forge factory in Claremore, Oklahoma. In March 1981, in connection with the sale, Walden, as tenant, entered into an agreement with Kyle Forge-Texas, as landlord, to lease the land on which the forge operations were located. Decedent, Kyle Forge-Texas, and Jetco also granted Walden an option to purchase the land under the lease. The option to purchase specified that:

WILLIAM DAVID WALDEN, or a corporation of which he owns 100% of the common stock, has the option to purchase the land now being used and leased by WILLIAM DAVID WALDEN for the total price of $30,000 at any time during the next ten years from the date hereof.

In the 3 years immediately prior to the sale to Walden, the gross sales of Kyle Forge-Texas exceeded $1 million and gross profits exceeded $200,000, as follows:

| Year | Gross sales | Gross profits |
|------|-------------|---------------|
| 1978 | $1,267,261 | $265,995 |
| 1979 | 1,544,744 | 205,000 |
| 1980 | 1,116,540 | 296,325 |

In the 6 months prior to the sale to Walden, Jetco purchased approximately $95,000 of forgings per month

from Kyle Forge-Texas. Following the sale to Walden, Jetco's purchases immediately dropped by 30 to 40 percent.

In August 1981, Jetco exercised its lease option to purchase the land underlying the forge factory. In October 1981, however, Jetco filed for bankruptcy and subsequently defaulted on its purchase of the land by failing to make payments.

In November 1982, the original owners of the land ordered Walden and Kyle Forge-Oklahoma to leave the property. Walden left the property without contesting his ejection. The owners of the land then filed suit to quiet title naming, inter alia, Walden, decedent, Kyle Forge-Texas, and Kyle Forge-Oklahoma as defendants.

In the spring of 1983, Walden had several confrontations with decedent wherein Walden attempted to exercise his purported rights in connection with the option to purchase. On June 30, 1983, Walden caused Kyle Forge-Oklahoma to file for bankruptcy.

In a statement of financial affairs attached to its bankruptcy petition, Kyle Forge-Oklahoma indicated that the corporation was the tenant under a real estate business lease in which decedent was the landlord. On a disclosure statement relating to its request for relief in bankruptcy, Kyle Forge-Oklahoma indicated that "the Company may have a cause of action against the estate of Henry Kyle, stemming from misrepresentations made to William Walden." Walden signed both the bankruptcy petition and the disclosure statement in his capacity as president of Kyle Forge-Oklahoma.

In January 1984, Walden filed a claim against decedent's estate for $4.8 million. In May 1984, Walden initiated a lawsuit against the estate in the U.S. District Court for the Northern District of Oklahoma (the Federal court action). Walden claimed that decedent was liable, inter alia, for fraud, breach of warranty, derivative liability, deceptive trade practices, and breach of contract. Walden requested general damages in the amount of $1.2 million, plus interest, punitive damages, and statutory treble damages.

In an answer to Walden's complaint, the estate denied liability. In July 1984, the estate filed a motion to dismiss

the Federal court action on the grounds that the court lacked subject matter jurisdiction.

In October 1984, decedent's executor timely filed a Federal estate tax return. On the estate tax return, Walden's claim was listed as a $1.2 million liability of the estate.

In February 1985, in conjunction with the Federal court action, Walden's deposition was taken in Tulsa, Oklahoma. Also in conjunction with the Federal court action, the estate obtained an appraisal of the land underlying the forge factory. That appraisal, which valued the land at $138,000 as of February 20, 1985, formed the basis for the executor's belief that the value of the land was $138,000.

In April 1985, the estate filed a counterclaim against Walden in the Federal court action. In May 1985, the estate filed a motion for partial summary judgment relating to its counterclaim. In July 1985, the estate filed a motion for summary judgment in the Federal court action. Also in July 1985, the parties to the Federal court action filed a joint statement of issues.

In September 1985, the Federal court action was dismissed for lack of diversity based on diversity of citizenship. The court specifically found that, for the purpose of determining jurisdiction, the principal place of doing business of Kyle Forge-Texas was Rogers County, Oklahoma.

After this dismissal, Walden filed suit against the same defendants in the District Court of Rogers County, Oklahoma (the State court action). In his original and amended petitions, Walden repeated the claims made in the Federal court action and requested damages of $1.2 million, plus interest, costs, punitive damages, and statutory treble damages.

In July 1986, the estate filed an answer and counterclaim in the State court action. In the answer portion of the pleading, the estate denied all substantive allegations and interposed four affirmative defenses. In the counterclaim portion of the pleading, the estate claimed damages for Walden's default on a promissory note in the amount of $362,000, plus interest, fees, and costs.

In July 1986, decedent's estate also filed a motion for summary judgment in the Oklahoma trial court. In its brief

in support of the motion for summary judgment, the estate argued that Walden was not the real party in interest with respect to any of the claims relating to the forge transaction. Rather, the estate argued that the bankruptcy trustee of Walden's bankrupt corporation, Kyle Forge-Oklahoma, was the real party in interest.

Walden filed a general response to the estate's motion for summary judgment arguing that summary judgment was not appropriate because there still existed a substantial controversy relating to the material facts in the case. In his response to the motion for summary judgment, however, Walden failed to attach any affidavits or exhibits controverting the factual evidence offered by the estate.

At a hearing on the estate's motion for summary judgment, Walden attempted to introduce the testimony of the bankruptcy trustee. The Oklahoma trial court, however, refused to permit Walden to present any witnesses to show that he was the proper party in interest because the rules of procedure required that such evidence be presented by affidavit.

By order dated August 15, 1986, the Oklahoma trial court granted the estate's motion for summary judgment and granted judgment against Walden in the amount of $362,000 on the estate's counterclaim. In May 1988, the trial court's decision was affirmed by the Oklahoma Court of Appeals. In its memorandum opinion, the Oklahoma Court of Appeals found that Walden had failed to controvert the estate's evidence that he was not the real party in interest and held that the trial court correctly granted summary judgment in favor of the estate. In February 1989, certiorari was denied by the Oklahoma Supreme Court, and the judgment in the State court action became final.

As of the date of trial of this case in November 1989, the estate had not paid any amount in satisfaction of or in compromise of the claims asserted by Walden. Similarly, the estate had not paid to any claimant any amount in satisfaction or compromise of claims arising out of decedent's transactions with Walden.

On its Federal estate tax return, petitioner claimed an estate tax deduction in the amount of $1.2 million as a

claim against the estate. In the notice of deficiency, respondent disallowed the claimed deduction because the estate had not established that any amount had been or would be paid.

## OPINION

Section 2001 imposes a tax on the transfer of the taxable estate of all decedents who are citizens or residents of the United States. The amount of the tax is determined, in part, by the value of the taxable estate. Sec. 2001(b). Section 2051 defines the value of the taxable estate as the gross estate less deductions.

The issues for decision are (1) whether an estate tax marital deduction pursuant to section 2056(b)(7) should be allowed for Mrs. Kyle's residual share of decedent's estate received in exchange for the surrender of her Texas homestead rights; and (2) whether a deduction pursuant to section 2053(a)(3) should be allowed for Walden's claim against decedent's estate. Petitioner bears the burden of proof on all issues presented. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

### *Marital Deduction*

Section 2056(a) allows a "marital deduction" from a decedent's gross estate for the value of property interests passing from a decedent to a surviving spouse. As a general rule, however, a marital deduction is denied for a "terminable interest," i.e., a property interest that will terminate or fail "on the lapse of time, on the occurrence of an event or contingency, or on the failure of an event or contingency to occur." Sec. 2056(b)(1). Thus, an interest in the nature of a life estate is ineligible for the marital deduction. See generally *Estate of Nicholson v. Commissioner*, 94 T.C. 666 (1990); *Estate of Higgins v. Commissioner*, 91 T.C. 61, 66 (1988), affd. 897 F.2d 856 (6th Cir. 1990).

### 1. *QTIP Deduction*

The Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172, added section 2056(b)(7) which allows a marital deduction for "qualified terminable interest prop-

erty" (QTIP) interests. QTIP interests are those interests in which a decedent passes to a surviving spouse a "qualifying income interest for life." Section 2056(b)(7)(B) provides, in pertinent part:

> (B) * * * For purposes of this paragraph—
>
> (i) IN GENERAL.—The term "qualified terminable interest property" means property—
>
>> (I) which passes from the decedent,
>>
>> (II) in which the surviving spouse has a qualifying income interest for life, and
>>
>> (III) to which an election under this paragraph applies.
>
> (ii) QUALIFYING INCOME INTEREST FOR LIFE.—The surviving spouse has a qualifying income interest for life if—
>
>> (I) the surviving spouse is entitled to all the income from the property, payable annually or at more frequent intervals, and
>>
>> (II) no person has a power to appoint any part of the property to any person other than the surviving spouse.
>
>       *     *     *     *     *     *     *
>
> (v) ELECTION.—An election under this paragraph with respect to any property shall be made by the executor on the return of tax imposed by section 2001. Such an election, once made, shall be irrevocable.

If a surviving spouse has a "qualifying income interest for life" under section 2056(b)(7)(B), that interest will not be treated as a terminable interest under section 2056(b)(1). The entire property, the life interest as well as the remainder, will be treated as passing to the surviving spouse and, accordingly, the entire property will qualify for the estate tax marital deduction. Pursuant to section 2044, the value of the property, to the extent not consumed, will be subject to estate tax through inclusion in the gross estate of the surviving spouse. Similarly, if there is any disposition of all or part of a qualifying income interest for life during the surviving spouse's lifetime, a gift tax will be imposed under section 2519. See H. Rept. 97-201 (1981), 1981-2 C.B. 352, 377-379.

The parties agree that, absent the legislative changes enacted by ERTA, the terminable interest provisions of section 2056(b)(1) would deny a marital deduction for a surviving spouse's Texas homestead right. The parties

disagree, however, on whether the Texas homestead right falls into the ERTA exception for QTIP's.

The parties agree that the estate is entitled to a marital deduction for 75 percent of Mrs. Kyle's residual share obtained in exchange for foregoing claims other than those under Texas homestead law. Accordingly, the only dispute concerning the marital deduction claimed by the estate concerns the deductibility of 25 percent of Mrs. Kyle's residual share received in exchange for the surrender of her Texas homestead rights.

A determination of the nature of the interest that passes to a surviving spouse is made under the law of the jurisdiction under which the interest passes. *Estate of Nicholson v. Commissioner, supra; Estate of Bowling v. Commissioner,* 93 T.C. 286, 293 (1989). In this case, we look to the law of Texas.

Petitioner argues that, because the Texas homestead rights would have qualified for a marital deduction as a QTIP interest under section 2056(b)(7), the 25 percent of Mrs. Kyle's residual share of the estate received in exchange for her homestead rights also qualifies for a marital deduction. Specifically, petitioner contends that (1) the homestead rights passed from decedent, (2) Mrs. Kyle's interest constitutes a QTIP interest, (3) the remote possibility of Mrs. Kyle's abandonment of her homestead rights is not sufficient to deny an estate tax deduction, and (4) the absence of a QTIP election should not be fatal to the deduction.

Respondent argues that the 25 percent of Mrs. Kyle's residual share of the estate received in exchange for her homestead rights is a nondeductible terminable interest. Specifically, respondent contends that the Texas homestead right is a terminable interest that "conferred something less than a life estate" on decedent's surviving spouse. Further, respondent argues that "a subsequent conversion of an initially defective, nondeductible terminable interest does not cure the defect and make the interest deductible." Finally, respondent argues that the absence of a proper election for QTIP treatment at the time the estate tax return was filed is fatal to the deduction.

## 2. *Texas Homestead Right*

The broad purpose of homestead laws is to protect the family from dependence and pauperism. *Estate of Johnson v. Commissioner,* 718 F.2d 1303, 1307 (5th Cir. 1983), revg. 77 T.C. 120 (1981). The Texas homestead law, article 16, section 52 of the Texas Constitution, provides:

Sec. 52. Descent and distribution of homestead; restrictions on partition.

Sec. 52. On the death of the husband or wife, or both, the homestead shall descend and vest in like manner as other real property of the deceased, and shall be governed by the same laws of descent and distribution, but it shall not be partitioned among the heirs of the deceased during the lifetime of the surviving husband or wife, or so long as the survivor may elect to use or occupy the same as a homestead * * * .

There are cases that point out the similarities between the homestead right under Texas law and a life estate. In *Williams v. Williams,* 569 S.W.2d 867, 869 (Tex. 1978), the court noted that the Texas homestead right has been held to be a right "in the nature of a legal life estate or life estate created by operation of law."

In *Fiew v. Qualtrough,* 624 S.W.2d 335, 337 (Tex. App. 1981), however, the court emphasized the differences between the homestead right and a life estate:

First, a homestead right is not a life estate in the pure sense of the term. Rather, "though not an estate in realty, [it] nevertheless *partakes of the nature* of an estate for life..." *Jones v. Dewbre,* 13 S.W.2d 233, 234 (Tex.Civ.App.—Austin 1928, no writ) * * * This treatment of the homestead estate as a life estate lasts so long as the property retains its homestead character. * * * The homestead character, and the homestead right, can be lost through abandonment. * * * Thus, it cannot be said that the estate in the nature of a life estate to which * * * [the surviving spouse] would have been entitled was indefeasibly vested as was the true life estate created in the will executed with her husband. While the two ran concurrently, it is obvious that she received an estate in the land as a result of the will to which her Constitutional homestead rights would not have entitled her. [Citations omitted.]

Respondent argues that, even if Texas homestead rights are not materially different from a life estate, there are certain differences that have significant implications for the QTIP deduction.

In *Estate of Johnson v. Commissioner,* 77 T.C. 120 (1981), revd. 718 F.2d 1303 (5th Cir. 1983), a pre-ERTA case, this

Court had occasion to consider the differences between the Texas homestead right and a life estate. At issue in that case was whether the value of a decedent's homestead property should be reduced, for Federal estate tax purposes, by the value of the surviving spouse's interest in the homestead.

In *Estate of Johnson v. Commissioner, supra,* the taxpayer, a resident of Texas, died and was survived by her husband. At her death, decedent owned, as her separate property, property that was claimed by decedent and her spouse as their homestead. Under the terms of her will, decedent devised the homestead property to her niece and nephew. After decedent's death, her husband asserted his right under Texas law to continue to use and occupy the property as his homestead. When decedent's Federal estate tax return was filed, the date-of-death value of the homestead property was reported in accordance with an appraisal that treated the homestead property as encumbered by the surviving spouse's homestead interest.

This Court held that homestead rights were encumbrances that reduced the fair market value at which the homestead property was includable in the gross estate. In holding that the husband's homestead interest was not includable in the decedent's gross estate, this Court expressly overruled the long-standing rule announced in *Estate of Hinds v. Commissioner,* 11 T.C. 314 (1948), affd. 180 F.2d 930 (5th Cir. 1950), requiring the inclusion of Texas homestead property in a decedent's gross estate without reduction for the value of the homestead interest of the surviving spouse. *Estate of Johnson v. Commissioner,* 77 T.C. at 128.

In analyzing the nature of Texas homestead rights, we noted that numerous Texas cases discuss the rights of a surviving spouse in terms of a life estate or "in the nature of a life estate." *Estate of Johnson v. Commissioner,* 77 T.C. at 124. We also noted that the homestead interest differs from a life estate in that the right to live on the property for life is personal to the surviving spouse. If the surviving spouse ceases to use the property as a homestead, the rights are terminated. In addition, the right to live on the property cannot be sold or conveyed, whereas a life estate can be sold or conveyed and is only terminated on

the death of the life tenant. *Estate of Johnson v. Commissioner*, 77 T.C. at 124 n. 3.

Because respondent had conceded that the Texas homestead rights were not dower, curtesy, or an interest created in lieu thereof, we rejected respondent's attempt to analogize the homestead rights to common law rights of dower and curtesy. We, therefore, concluded that section 2034 and the regulations thereunder were inapplicable to homestead rights. *Estate of Johnson v. Commissioner*, 77 T.C. at 125.

The Court of Appeals for the Fifth Circuit, to which this case is appealable, reversed the decision of this Court and held that the surviving spouse's homestead interest under Texas law is includable in decedent's gross estate under section 2034. Noting that section 2034 provides for inclusion in the gross estate of interests only if they are dower or curtesy or if they replace interests characterized as such under State law, that court held that "the operation of the second clause of section 2034 is dependent upon the intent of State legislators in enacting the relevant statute." *Estate of Johnson v. Commissioner*, 718 F.2d at 1312.

After an examination of the history and origins of the Texas homestead provision, the Court of Appeals concluded:

> The historical development of the Texas homestead law, taken together with the express language of Texas' short-lived dower statute, convinces us that the forced heirship provision of the Texas homestead law clearly replaced interests characterized as dower under Texas law. Accordingly, we hold that this provision was enacted in lieu of dower for purposes of section 2034 and, therefore, that the surviving spouse's homestead interest must be included in the decedent's gross estate in accordance with that section. [*Estate of Johnson v. Commissioner*, 718 F.2d at 1314.]

In addition to the historical development of dower and homestead rights in Texas, the Court of Appeals found support for its conclusion in 34 years of congressional acquiescence in the rule of inclusion previously established in *Estate of Hinds v. Commissioner, supra. Estate of Johnson v. Commissioner*, 718 F.2d at 1316.

As petitioner acknowledges, under the law in the Fifth Circuit for cases not affected by ERTA, Mrs. Kyle's homestead interest would be included in decedent's estate. We must consider, however, whether ERTA's provisions for QTIP interests change this result.

### 3. *Mrs. Kyle's Interest in Decedent's Estate*

In order for property to be classified as a QTIP interest, the surviving spouse must have a "qualifying income interest for life" in the property. Sec. 2056(b)(7)(B)(i)(II). The "qualifying income interest for life" requirement has two components. First, the surviving spouse must have a right to all of the income from the property for life, payable annually or more frequently. Sec. 2056(b)(7)(B)(ii)(I). Second, no one may have the power to appoint any part of the property subject to the qualifying income interest to any person other than the surviving spouse during the lifetime of the surviving spouse. Sec. 2056(b)(7)(B)(ii)(II).

Respondent argues that, unlike a life estate, Mrs. Kyle's homestead right could be lost through abandonment. Because the homestead right is subject to termination upon the occurrence of a specified event, such as abandonment, respondent contends that the homestead right is not an unconditional "qualifying income interest for life" for purposes of section 2056(b)(7)(B). Respondent cites the legislative history of ERTA to demonstrate what Congress meant by the "qualifying income interest for life" requirement. Specifically, H. Rept. 97-201, 1981-2 C.B. 352, 378 states:

income interests granted for a term of years or life estate subject to termination upon remarriage or the occurrence of a specified event will not qualify under the committee bill.

Petitioner contends that abandonment is not easily proven against a surviving spouse and points out that, in the instant case, Mrs. Kyle would not abandon her right to occupy or rent a home worth over $1 million where the remainder belonged to children from decedent's previous marriages. Petitioner argues that the remote possibility of abandonment should not prevent the Texas homestead right from being treated as a qualifying income interest for life. Petitioner's remoteness argument, however, is based on speculation and not on any evidence of the actual intent of Mrs. Kyle, who lived in California, while the subject homestead was in Texas.

Petitioner also argues that, as a matter of policy, there is no reason to deny a marital deduction for the homestead right because the homestead property will be taxed in the

surviving spouse's estate or as a gift. Finally, petitioner contends that "the isolated bit of legislative history cited by Respondent should not be read as forbidding QTIP treatment whenever an otherwise qualifying interest might terminate on occurrence of a specified event."

Contrary to petitioner's assertions, it is the possibility, not the probability, that an interest will terminate or fail that will determine whether the surviving spouse's interest is a "qualifying income interest for life." Although the Texas homestead right is similar to a life estate, it is different and distinguishable in that the homestead right is personal to the surviving spouse and the right to live on the property cannot be sold or conveyed. Thus the surviving spouse has a significantly restricted (terminable) power over the homestead property.

Because an abandonment would terminate the surviving spouse's homestead right, Mrs. Kyle's statutory interest in decedent's estate is a nonqualified terminable interest. There is no indication that the ERTA extension of the marital deduction to certain types of life estates was intended to cover interests that would lapse on events or occurrences other than the death of or a conveyance by the surviving spouse. Accordingly, we conclude that the Texas homestead right is not a "qualifying income interest for life," and decedent's estate is not entitled to an estate tax marital deduction for Mrs. Kyle's share of the residual estate received in exchange for her Texas homestead right.

Alternatively, petitioner argues that, even if the homestead right itself does not qualify for the marital deduction, Mrs. Kyle's residual share of decedent's estate received in exchange for her homestead right may qualify for the marital deduction. Respondent contends that, where the homestead right surrendered does not qualify for the marital deduction, the residual interest received in exchange for that right likewise does not qualify for the marital deduction. In support of his position, respondent cites section 20.2056(b)-1(e)(3), Estate Tax Regs., which provides that, if the initial interest that passes from a decedent to a surviving spouse is a nondeductible interest, subsequent conversions of that interest can have no effect on deductibility.

We have held that the homestead right is not an interest in qualified terminable interest property and, therefore, is not eligible for the estate tax marital deduction. The residual share of decedent's estate that Mrs. Kyle received in exchange for her homestead right was in the nature of a payment for her statutory interest and likewise is not a QTIP interest.

### 4. *QTIP Election*

In order to qualify for QTIP treatment, an election must be made. Sec. 2056(b)(7)(B)(v). Respondent argues that the executor's failure to make the required QTIP election renders the homestead right ineligible for QTIP treatment. Respondent, however, asks the Court to render an opinion on the broader issue "so as to provide guidance to Texas estate planners and to preclude the necessity of another estate being forced to litigate this issue (when a 'proper' election has been made)."

Petitioner points out that the homestead property did not in fact pass to Mrs. Kyle because of the terms of the compromise settlement agreement. Petitioner argues that, where a settlement occurs, there is no reason to require an election. Petitioner notes that the policy leading to the requirement of an affirmative QTIP election is to ensure that the value of the entire property is taxed at least once. Petitioner contends, however, that the settlement ensures that the value of the entire property will be taxed at least once; the cash value of the homestead interest will be taxed in Mrs. Kyle's estate while the remaining value of the homestead will be taxed in decedent's estate.

In *Estate of Higgins v. Commissioner*, 91 T.C. 61 (1988), affd. 897 F.2d 856 (6th Cir. 1990), we considered whether literal compliance with the QTIP election provision was required. After considering the purpose of the election, its relationship to other Internal Revenue Code provisions, and the terms of the underlying statute, we concluded:

An unequivocal manifestation of an affirmative intent to make the election of QTIP treatment on the estate tax return is, in our opinion, required because the effect of an election is not confined to the marital deduction obtained by the electing estate. * * *

\* \* \* \* \* \* \*

·Thus, the QTIP election carries ·with it burdens as well as the benefit of a marital deduction for the electing estate. The essence of the election requirement is that the executor of the spouse first to die unequivocally communicate his election and implicit agreement to accept the burdens as well as the benefits of the tax treatment afforded by the section.
  [Citations omitted. 91 T.C. at 69-70.]

In the instant case, petitioner answered "No" in response to the question "Do you elect to claim a marital deduction for an otherwise nondeductible interest under section 2056(b)(7)?" On Schedule M of the estate tax return, however, petitioner claimed an estate tax marital deduction for property passing to a surviving spouse, including a $448,848 deduction for a "distributive share."

Despite petitioner's negative answer to the election question, respondent has agreed that the estate is entitled to a marital deduction for decedent's community share of the insurance policy. Because we have denied petitioner's estate tax marital deduction for Mrs. Kyle's homestead right on other grounds, we need not decide whether the estate's negative response to the QTIP election question on its Form 706 would have been fatal.

### Claim Against the Estate

As in effect at the time of death, section 2053(a)(3) authorized a deduction from the gross estate for claims against the estate.

In this connection, section 20.2053-4, Estate Tax Regs., provided:

The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured, and interest thereon which had accrued at the time of death * * * Only claims enforceable against the decedent's estate may be deducted. * * *

With respect to estimating amounts claimed as deductions, section 20.2053-1(b)(3), Estate Tax Regs., provided:

An item may be entered on the return for deduction though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid. No deduction may be taken upon the basis of a vague or uncertain estimate. * * *

Decedent was involved in a business transaction in 1981. Decedent died in 1983, and his estate tax return was filed in 1984. In 1984, decedent's business associate, Walden, filed a claim against the estate for $4.8 million. Also in 1984, Walden initiated a lawsuit against the estate in Federal court. In 1985, when the Federal court action was dismissed for lack of diversity of citizenship, Walden filed suit in an Oklahoma district court. In 1986, the Oklahoma trial court granted the estate's motion for summary judgment on the grounds that Walden's bankrupt corporation was the real party in interest. Finally, in 1989, the State court action became final when the Oklahoma Supreme Court denied Walden's petition for certiorari.

On its Federal estate tax return, petitioner claimed an estate tax deduction for a claim against the estate in the amount of $1.2 million. Respondent disallowed the claimed deduction.

Respondent sets forth two theories for his denial of the estate's deduction for the Walden claim. First, respondent argues that the law requires this Court to deny the deduction based upon a rule of "no payment, no deduction." Second, respondent argues that, under the facts of the instant case, the estate is not entitled to the deduction because the estate failed to present evidence establishing the merits underlying the Walden claim and because the dismissals of the Walden claim in Federal and State court actions adjudicated the merits underlying the claim.

Petitioner contends that respondent's first position is an oversimplification and asks that the Court independently evaluate the existence, enforceability, and value of the Walden claim as of the date of decedent's death. Petitioner also argues that the uncontroverted evidence in this record demonstrates that, under Oklahoma law, Walden had a valid claim against the estate as of the date of decedent's death.

## 1. *Relevance of Post-Death Events*

The starting place for any discussion of the effect of post-death events on deductibility must be *Ithaca Trust Co. v. United States,* 279 U.S. 151 (1929). In *Ithaca Trust,* the decedent left substantial sums in trust for his widow, with a

remainder to charity. Ordinarily, an estate tax return would have been filed claiming a charitable deduction based on the estimated actuarial value of the charitable remainder based on the widow's life expectancy. The widow, however, died before the filing of the estate tax return. The estate therefore claimed a charitable deduction based on the actual amount passing to charity because of the widow's early demise, a larger sum than the actuarial estimate. The Court of Claims upheld the larger deduction based on actual post-death events, but the Supreme Court reversed. The Supreme Court observed:

The first impression is that it is absurd to resort to statistical probabilities when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator's death. * * * Therefore the value of the thing to be taxed must be estimated as of the time when the act is done. * * * Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true. * * * Tempting as it is to correct uncertain probabilities by the now certain fact, we are of the opinion that it cannot be done * * * [279 U.S. at 155.]

Notwithstanding *Ithaca Trust*, lower courts have frequently considered post-death events in determining the deductibility of claims. See cases cited and discussed in *Estate of Sachs v. Commissioner*, 88 T.C. 769 (1987), affd. in part and revd. in part 856 F.2d 1158 (8th Cir. 1988); *Estate of Van Horne v. Commissioner*, 78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983).

In *Estate of Van Horne v. Commissioner, supra,* this Court observed that "all of the cases in this field dealing with post-death evidence are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision." 78 T.C. at 736-737. There appear to be two broad categories of cases that have considered post-death events: (1) Cases concerning the valuation of claims that are certain and enforceable at the time of death and (2) cases concerning the enforceability of disputed or contingent claims against the estate. *Estate of Van Horne v. Commissioner*, 78 T.C. at 734-739 and the cases cited therein.

At the time of her death, the decedent in *Estate of Van Horne* was obligated to pay spousal support to her surviv-

ing ex-husband for the remainder of his life. The ex-husband, however, died approximately 7 months after decedent and approximately 2 months before the estate tax return was filed. 720 F.2d at 1115.

Because the obligation at issue was fully enforceable as of the date of the decedent's death, that court again held that the estate was entitled to a deduction for the actuarial value of the debt computed without regard to events occurring subsequent to the date of death. Thus, the lifetime spousal support obligation was valued at the date of decedent's death even though the surviving ex-spouse died prior to the filing of the estate tax return. 720 F.2d at 1117.

In *Estate of Van Horne v. Commissioner, supra,* we analyzed these cases and concluded that we must consider post-death events in cases concerning the enforceability of claims against the estate. We also concluded, however, that the general principle announced in *Ithaca Trust* is applicable in cases involving the *valuation* of claims against the estate. 78 T.C. at 734-735.

In *Estate of Van Horne v. Commissioner,* 720 F.2d 1114 (9th Cir. 1983), the Court of Appeals for the Ninth Circuit affirmed our decision, also distinguishing between cases involving the enforceability of a claim and those involving the valuation of an enforceable claim.

Any appeal in this case lies to the Court of Appeals for the Fifth Circuit, and we are bound by any decision of that court squarely in point. *Golsen v. Commissioner,* 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

In *Estate of Hagmann v. Commissioner,* 60 T.C. 465, 468-469 (1973), affd. 492 F.2d 796 (5th Cir. 1974), certain debts of the decedent constituted bona fide obligations of his estate. No claims against the estate were filed with respect to the debts, however, and the claims became void and unenforceable under State law. Because the debts would never be paid by the estate, no deduction was allowed for the debts. In these circumstances, this Court held that the broad doctrine of *Ithaca Trust* was of limited applicability. We held that post-death events could be considered and "claims without substance cannot reduce the estate subject

to taxation." 60 T.C. at 469. The Court of Appeals for the Fifth Circuit affirmed per curiam.

The dispute in this case involves enforceability or validity of Walden's claim, not just valuation of a valid claim. Thus we look to post-death events to determine whether the Walden claim was a valid claim against decedent's estate.

## 2. *Enforceability of the Walden Claim*

Petitioner argues that the estate's victory as a result of unexpected procedural blunders by Walden is not evidence as to the existence, enforceability, or value of the claim and therefore should not be considered. Respondent contends that the estate's courtroom victories indicate the nonexistence and nonenforceability of the Walden claim.

Petitioner contends that the record provides ample evidence of the enforceability and value of the Walden claim. Specifically, petitioner argues that uncontroverted evidence in the record shows that decedent misled and manipulated Walden, demonstrating bad faith dealings throughout their business transaction. The documents relating to the pleadings in the Federal and State court actions were stipulated to by the parties. These documents, however, are merely evidence of the positions and allegations of the parties to those actions and not evidence that Walden could or should prevail.

The attorney who represented the estate in the State court testified that the victory in the State appellate court was unexpected. He stated:

I just thought because of the nature of the claim and the facts that happened, the circumstances around Mr. Kyle's death, the fact that the other entities had taken bankruptcy, that that was a major part of the sale, the inducement, if you would, to buy this forge company, the fact that there was not really any ownership in this real estate, that he could not have delivered title to real estate, would not set well in a local rural jury when you have a—if you will, Your Honor—high-roller Texas promoter on one hand as a defendant and a local boy that was trying to start a business up. And I just didn't think it would set well, and I was very fearful that there could be some severe damages there.

He did not, however, provide any evidence that the claim was *valid.*

Petitioner argues that, if the standards of proof of a State law court are applied, respondent has failed to meet the burden of presenting evidence to support his position. Specifically, petitioner contends that:

Respondent must surely accept the correlative burden of presenting some evidence to controvert the underlying validity of Walden's claims. Respondent has wholly failed to meet that burden. Respondent called no witnesses, by deposition or otherwise, to controvert any of the testimony of Walden or other evidence introduced by Petitioner. Because there is no evidence to controvert the underlying merits of Walden's claims, those claims, together with the damages alleged by Walden, must be taken as true and correct. * * *

In this case, however, petitioner has the burden of proving the validity of the claimed deduction. See *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440 (1934); *Rockwell v. Commissioner,* 512 F.2d 882, 885-886 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. Petitioner is, in effect, asking us to render summary judgment in Walden's favor in a dispute that reeks of uncertainty and material issues of fact. The State courts, on records including evidence from the estate factually refuting Walden's claim, decided against him. We are not persuaded that these State court decisions can be cast aside, as petitioner seeks, as merely based on a procedural error by Walden. The decision was, as a matter of law, made on the merits in the absence of evidence controverting facts alleged by the estate.

Petitioner has presented no evidence from which we can determine that Walden would have prevailed if he had not encountered the difficulties reflected in the records of the Federal and State court proceedings. It is illogical to conclude that his claim should be treated as valid and valuable where the only evidence is from cases that he lost.

Petitioner has not carried its burden of proving that the Walden claim was a valid, enforceable claim against the estate at the date of decedent's death and, therefore, no estate tax deduction is allowable for the claim. The record in the instant case is insufficient for a finder of fact to conclude that the estate was liable to Walden for damages of $1.2 million, or any amount.

To reflect concessions by the parties,

*Decision will be entered under Rule 155.*