108 T.C. No. 20


UNITED STATES TAX COURT


ESTATE OF ALGERINE ALLEN SMITH, DECEASED, JAMES ALLEN SMITH,
  EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
                  Respondent


Docket Nos. 19200-94, 3976-95.          Filed June 4, 1997.


        During 1975 through 1980, decedent received
royalties from Exxon, which she reported as income.  In
1983, Exxon was ordered to make restitution for
overcharging its customers.  Exxon made restitution and
in 1988 filed suit in District Court against decedent
and other royalty interest owners for reimbursement of
the portion of the royalties attributable to Exxon's
overcharges.  Decedent contested Exxon's claim.

        Decedent died on Nov. 16, 1990.  On Feb. 15, 1991,
the District Court determined that the royalty interest
owners were liable to Exxon for restitution of the
portion of royalties based on Exxon's overcharges.  The
District Court referred the calculation of the amount
of this liability to a special master.  In April 1991,
Exxon claimed that P owed a total of $2,482,719.  On
its Federal estate tax return, filed July 12, 1991, P
claimed a deduction for $2,482,719 pursuant to sec.
2053(a)(3), I.R.C.  On Feb. 10, 1992, P and Exxon

entered into a settlement agreement, which resolved Exxon's claim for a total amount of $681,839.  R determined that P's sec. 2053(a)(3), I.R.C., deduction was limited to $681,839.

As a result of paying Exxon an amount that decedent had previously reported as income, P is entitled to tax relief pursuant to the provisions of sec. 1341(a), I.R.C.  R determined that the income tax benefit derived by P through application of sec. 1341(a), I.R.C., was an asset includable in the gross estate.

Held:  Exxon's claim against decedent was uncertain and unenforceable as of the date of decedent's death.  P's deduction pursuant to sec. 2053(a)(3), I.R.C., is limited to the amount paid in settlement of the claim.

Held, further:  The income tax benefit derived by P as a result of the application of sec. 1341(a), I.R.C., is an asset includable in the gross estate. P's deduction pursuant to sec. 2053(a)(3), I.R.C., of its liability to Exxon and its sec. 1341(a), I.R.C., relief based on payment of that liability are so inextricably linked that it would be inappropriate to consider one in the determination of the taxable estate while excluding the other.

Michael C. Riddle and Harold A. Chamberlain, for petitioner.

Carol Bingham McClure, for respondent.


OPINION


RUWE, Judge:  In docket No. 19200-94, respondent determined an estate tax deficiency of $663,785 and an accuracy-related penalty under section 6662(a)[1] in the amount of $132,785.[2]  In

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of
(continued...)

docket No. 3976-95, respondent determined a deficiency of $558,272 in petitioner's Federal income tax for 1992. The deficiency determined in docket No. 3976-95 represents an alternative position taken by respondent to protect the Government's interest in the event its position in docket No. 19200-94 is not sustained.

After concessions, the issues remaining for decision are: (1) Whether petitioner's section 2053(a)(3) deduction for a claim against the estate is limited to the amount for which the claim was settled following decedent's death; (2) if petitioner is entitled to a section 2053(a)(3) deduction for the entire amount claimed on the Federal estate tax return, whether petitioner realized discharge of indebtedness income pursuant to section 61(a)(12) when it settled the claim in question for a lesser amount; and (3) whether the income tax benefit derived by petitioner as a result of the application of section 1341(a) is an asset which increases the gross estate.

## Background

This case was submitted fully stipulated pursuant to Rule 122. The stipulation of facts, supplemental stipulation of

---

[1](...continued)
Practice and Procedure.

[2]Respondent has conceded the accuracy-related penalty under sec. 6662(a).

facts, and stipulation of settled issues are incorporated herein by this reference.

Algerine Allen Smith (decedent) died testate on November 16, 1990, in Texas. James Allen Smith, decedent's son, is the executor of the estate. Mr. Smith resided in Larchmont, New York, at the time he filed the petition in this case.

On April 23, 1970, decedent, as lessor, entered into an Oil, Gas and Mineral Lease with Humble Oil & Refining Co. (Humble). Pursuant to this lease agreement, decedent retained a royalty interest in oil and gas production obtained from an 80-acre tract of land in Wood County, Texas. On April 23, 1970, Jessamine and Frankie Allen, decedent's aunts, also entered into oil and gas leases with Humble, pursuant to which they retained royalty interests from the oil and gas production obtained from certain tracts of land in Wood County. Humble was subsequently acquired by Exxon Corporation (Exxon).

Jessamine and Frankie Allen died in 1979 and 1989, respectively, and decedent served as the independent executrix of both estates. Upon Jessamine's death, decedent inherited a portion of Jessamine's interest in the leased property. Upon Frankie's death, decedent inherited all Frankie's interest in the leased property, as well as the remaining portion of Jessamine's interest which Frankie had previously inherited.

Decedent's, Frankie's, and Jessamine's interests in the Wood County property were part of a unit formation known as the

Hawkins Field Unit (HFU).  The Texas Railroad Commission, which regulates oil and gas operations in Texas, approved the HFU for unitization on November 26, 1974.  In a unit agreement, effective January 2, 1975, interest owners in the area utilized oil and gas rights pertaining to the unitized formation.  The unit agreement embraces interests of approximately 2,200 royalty interest owners[3] and 300 working interest owners.  Exxon is the sole unit operator of the HFU and possesses the exclusive right to conduct HFU operations pursuant to a unit operating agreement between Exxon and the other working interest owners.[4]

During the early operation of the HFU, the Federal Government, acting initially through the Federal Energy Administration and later through the Department of Energy (DOE), regulated the price of domestic crude oil through the application of two-tier price regulations under 10 C.F.R. secs. 212.73 and 212.74 (1975).  Producers were required to sell "old" crude oil at the lower tier price and were allowed to sell "new" crude oil at a higher price.

In June 1978, the DOE filed suit against Exxon as operator of the HFU.  The DOE contended that Exxon had misclassified crude oil produced from the HFU, which resulted in overcharges in violation of the DOE's petroleum price regulations.  Exxon

---

[3]Decedent, Jessamine, and Frankie were royalty interest owners.

[4]Exxon was the HFU's largest working interest owner.

vigorously defended against the DOE's allegations.  Nevertheless, on October 9, 1980, Exxon announced to the HFU interest owners that it would begin to withhold amounts owed to the interest owners under Exxon's posted prices for the oil produced.  In justification for tendering less than the amount due under Exxon's classification of the oil, Exxon stated that it desired to create a fund for payment of any liability it might eventually have to the DOE.  The amounts withheld represented the difference between the higher price charged by Exxon and the lower price the DOE contended was the maximum lawful selling price.  Exxon withheld these amounts from October 1, 1980, to January 28, 1981, the date on which oil prices in the United States were decontrolled.

In response, certain HFU royalty interest owners filed suit against Exxon in October 1980 in the U.S. District Court for the District of Texas (Tyler Division), arguing that Exxon was required to pay them the full amount of their royalty.  Jarvis Christian College v. Exxon Corp., docket No. TY-80-432-CA (the Jarvis Christian litigation).  On February 6, 1981, decedent, individually and as executrix for the estate of Jessamine Allen, along with Frankie and other members of the Allen family (the Allen parties), filed a motion to intervene as party plaintiffs in the Jarvis Christian litigation.  On February 24, 1981, the District Court filed an order granting leave to intervene.

On March 25, 1983, the U.S. District Court for the District of Columbia ruled that Exxon had violated the two-tier pricing regulations.  United States v. Exxon Corp., 561 F. Supp. 816 (D.D.C. 1983) (Exxon I).  The District Court entered judgment in favor of the DOE and ordered Exxon to make restitution to the U.S. Treasury (Treasury) of the full amount of HFU overcharges plus interest arising from sales of HFU crude oil for the period January 1, 1975, through January 27, 1981.  The total amount of the judgment exceeded $895 million.  On July 1, 1985, the Temporary Emergency Court of Appeals affirmed the District Court.  United States v. Exxon Corp., 773 F.2d 1240 (Temp. Emer. Ct. App. 1985).

On February 27, 1986, Exxon paid the judgment, which amounted to just under $2.1 billion with interest.  The amount paid consisted of $895,501,164 in overcharges, $771,997,881 in prejudgment interest, and $428,273,813 in postjudgment interest.

On January 26, 1988, Exxon filed suit in the U.S. District Court for the Eastern District of Texas (Tyler Division) against the owners of royalty and mineral interests in the HFU.  Exxon v. Arnold, docket No. TY-88-110-CA (E.D. Tex., Jan. 26, 1988). Exxon's suit was consolidated with the Jarvis Christian litigation at docket No. TY-80-432-CA (Consolidated Action).[5] Exxon sought reimbursement from the interest owners of the

_____

[5]Hereinafter, we shall refer to this consolidated action as the Jarvis Christian litigation.

amounts which it had paid to the Treasury as a result of the DOE litigation.

Decedent, individually and as the executrix of the estate of Jessamine Allen, and Frankie were parties to the suit. The Jarvis Christian defendants vigorously contested Exxon's claims. On July 22, 1988, the Jarvis Christian defendants filed a motion for judgment for lack of Federal statutory or common law claims, asserting that neither Federal statutory law nor common law authorized any of Exxon's claims against them.

On November 7, 1989, the District Court issued an order granting an oral motion for reverse bifurcation. The District Court ordered that the trial on the damages issue in the case would precede trial on the liability issue. By order dated December 5, 1989, the District Court directed the parties to file any motions for summary judgment with respect to the issue of whether Exxon had suffered any damages. Pursuant to this order, on January 16, 1990, the royalty and working interest owners filed a joint motion for summary judgment and memorandum in support of their motion against Exxon. In their accompanying memorandum, the interest owners denied that any amounts were owed to Exxon, regardless of whether any liability under law could attach to them, because Exxon had not, in fact, suffered any loss in paying the approximately $2.1 billion judgment.[6]

---

[6]The Allen parties expressly adopted the joint motion for
(continued...)

Decedent died on November 16, 1990.

On February 15, 1991, the District Court issued an order determining in part that the royalty interest owners were liable to Exxon under Federal common law for restitution of overcharges received by them on account of the misclassified oil. Despite its previous order bifurcating the issues, the District Court rendered summary judgment on both the liability and damages issues. The District Court then referred the calculation of damages to a special master.

In April 1991, Michael Riddle, decedent's attorney for estate tax purposes, and James Knowles, her attorney in the Jarvis Christian litigation, attended a meeting with representatives of Exxon in Houston, Texas, at which Exxon presented its calculation of the amounts owed by the Allen parties. Exxon claimed a total of $2,482,719 from decedent's estate, which included interest.[7] Exxon had sought prejudgment interest beginning in February 1975 and postjudgment interest beginning in June 1983 with respect to the amounts it had paid to the Treasury in Exxon I. However, in its February 15, 1991, order, the District Court in the Jarvis Christian litigation determined that Exxon was only entitled to prejudgment interest

_____

[6](...continued)
summary judgment filed on Jan. 16, 1990.

[7]The amount claimed by Exxon included amounts sought from Jessamine's and Frankie's interests, which the decedent had inherited.

beginning on the date Exxon paid the judgment in Exxon I (February 27, 1986) and continuing until the judgment date in the Jarvis Christian litigation, and thereafter for postjudgment interest.

On July 12, 1991, the executor of decedent's estate filed a United States Estate (and Generation-Skipping Transfer) Tax Return (Form 706). On the return, the entire $2,482,719 sought by Exxon was deducted as a claim against the estate pursuant to section 2053(a)(3).

On September 10, 1991, the special master in the Jarvis Christian litigation issued an order regarding the procedures to be followed in determining the damages, if any, concerning each defendant. On September 23, 1991, the Allen parties filed a response to the special master's order, wherein they objected to Exxon's damage calculations.

On February 10, 1992, petitioner and Exxon entered into a settlement agreement with respect to the litigation. Pursuant to the settlement, petitioner paid Exxon $421,276.60 and surrendered to Exxon for a period of 7 years Frankie Allen's royalty interest in the HFU, which had a fair market value of approximately $260,563.00 when assigned. Petitioner thus resolved Exxon's disputed claim for a total amount of $681,839.60. On April 6, 1992, Exxon and the Allen parties filed a stipulation of dismissal. On April 29, 1992, the District Court ordered that

all claims presented by the parties with respect to the litigation were dismissed.

## Discussion

The first issue we must decide is whether petitioner is entitled to a deduction pursuant to section 2053(a)(3) in the amount reported on the estate tax return ($2,482,719.00) or in the amount ultimately paid to Exxon in settlement of the relevant claim ($681,839.60). To do so, we must determine whether events subsequent to the date of decedent's death are to be taken into account in establishing the amount of the deduction to which petitioner is entitled.

The Internal Revenue Code imposes a Federal estate tax on the transfer of the taxable estate of a decedent who is a citizen or resident of the United States. Secs. 2001 and 2002. Section 2053(a)(3) allows a deduction from the gross estate for claims against the estate that are allowable by the laws of the jurisdiction under which the estate is administered. Section 20.2053-4, Estate Tax Regs., provides that "The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death * * * Only claims enforceable against the decedent's estate may be deducted." Section 20.2053-1(b)(3),

Estate Tax Regs., disallows a deduction that is "taken upon the basis of a vague or uncertain estimate."

Petitioner argues that it is entitled to a deduction pursuant to section 2053(a)(3) for the entire amount reported on the estate tax return. Petitioner relies upon Ithaca Trust Co. v. United States, 279 U.S. 151, 155 (1929), in which the Supreme Court ruled that for purposes of determining the value of the deduction for a charitable remainder, a life tenant's premature death could not be substituted for the actuarial computation of the life tenant's life expectancy as of the date of the decedent's death. The Supreme Court stated that "The estate so far as may be is settled as of the date of the testator's death." Id. Petitioner contends that the Supreme Court's rationale in Ithaca Trust supports petitioner's position in the instant case.

In Estate of Van Horne v. Commissioner, 78 T.C. 728, 733-738 (1982), affd. 720 F.2d 1114 (9th Cir. 1983), we reviewed the case law in this area and determined that the principle articulated in Ithaca Trust is generally applicable in cases involving the valuation of a claim that is valid and fully enforceable on the date of the decedent's death. See Estate of Kyle v. Commissioner, 94 T.C. 829, 848-851 (1990).[8] On the other hand,

_____

[8]In Estate of Kyle v. Commissioner, 94 T.C. 829, 849 (1990), and Estate of Van Horne v. Commissioner, 78 T.C. 728, 736-737 (1982), affd. 720 F.2d 1114 (9th Cir. 1983), we reviewed the case law in this area and noted that all the cases dealing with postdeath events are not "easily reconciled". We see no need to
(continued...)

postdeath events warrant consideration where the decedent's creditor has only a potential, unmatured, contingent, or contested claim which requires further action before it becomes a fixed obligation of the estate. Estate of Van Horne v. Commissioner, supra at 735. Where a claim is disputed, contingent, or uncertain as of the date of the decedent's death, the estate is not entitled to a deduction until the claim is resolved and it is determined what amount, if any, will be paid. It is this latter amount that is allowed as a deduction. See, e.g., Propstra v. United States, 680 F.2d 1248, 1253 (9th Cir. 1982); Estate of Taylor v. Commissioner, 39 T.C. 371, 375 (1962), affd. sub nom. Gowetz v. Commissioner, 320 F.2d 874 (1st Cir. 1963); Estate of Cafaro v. Commissioner, T.C. Memo. 1989-348.

In Estate of Cafaro v. Commissioner, supra, for instance, the taxpayer claimed several deductions pursuant to section 2053(a)(3) which exceeded the amounts for which the estate ultimately settled the claims in issue, and the Commissioner disallowed these deductions to the extent they exceeded the amounts of the settlements.[9] This Court found that the settlement of the claims "indicates that, rather than being a

_____

[8](...continued)
review all these prior cases in order to resolve the instant case.

[9]One claim was settled before the taxpayer filed its Federal estate tax return, while the other was settled after the return had been filed. Estate of Cafaro v. Commissioner, T.C. Memo. 1989-348.

claim for a sum certain legally enforceable at the date of the decedent's death, the claim was potential, unmatured, contested, or contingent at the date of the decedent's death." Id. As a result, we concluded that postdeath events--i.e., the future settlements of the claims--had to be taken into account in determining the proper amounts of the deductions to which the estate was entitled.

In Estate of Taylor v. Commissioner, 39 T.C. at 372, a husband and wife had entered into a separation agreement requiring the husband to pay $500 a month to his wife for her life or until she remarried. Upon the husband's death, the wife made a demand upon the executors for continuation of the monthly payments. The estate refused the wife's claim on the ground that it was the intention of the parties to the separation agreement that the payments would cease with the death of the husband. While the matter was in litigation, the estate took a deduction of $95,982 on its Federal estate tax return, which represented the present value of the wife's right to receive $500 monthly until she died or remarried. The following year the wife remarried, and approximately 2 years thereafter, the Supreme Judicial Court of Massachusetts ruled that the estate was liable for payments for the period up to the wife's remarriage. Pursuant to this decree, the estate paid to the wife $12,500 in satisfaction of her claim.

We upheld the Commissioner's determination that the estate was only entitled to a deduction of $12,500; i.e., the amount it actually paid.  We stated that

> because of the uncertainty as to whether the estate would ever pay any amount to Alice [the decedent's wife] on her disputed claim, the estate's liability was contingent, and the outcome of such dispute must be looked to before the estate would be entitled to a deduction.
>
> Clearly the contesting of Alice's claim was not a frivolous or capricious act, but was based upon legal arguments which the estate deemed of sufficient importance to merit the attention of the highest court of Massachusetts.
>
> The value of the claim for deduction purposes was not reasonably ascertainable until the litigation ended and the estate finally recognized its liability to Alice.  * * *  [Id. at 375; citations omitted.]

On brief, petitioner argues that Exxon's claim was certain and enforceable on the date of decedent's death, thereby entitling petitioner to deduct the entire amount of the claim in determining the value of decedent's taxable estate.  Petitioner posits several arguments in support of its position.  We shall address each one in turn.

First, petitioner contends that the HFU interest owners' liability for the overcharges was the actual basis for the litigation in Exxon I, which was decided in 1983.  Petitioner asserts that Exxon was required to make restitution only because it was deemed necessary for the effective enforcement of the oil pricing regulations.  Thus, petitioner maintains that Exxon's

claim was enforceable at the time of decedent's death. We disagree.

The record clearly indicates that the issue in Exxon I was whether Exxon had overcharged its crude oil purchasers for oil produced in the HFU. Contrary to petitioner's argument, Exxon I did not consider whether Exxon had overpaid its royalty and working interest owners in the HFU. While Exxon attempted to join the Jarvis Christian plaintiffs as indispensable parties, its efforts were unsuccessful. Rather, the Jarvis Christian plaintiffs were invited to intervene in Exxon I if they "desired 'an earlier determination' of their claims" that Exxon should continue paying them royalties based on the higher price under the two-tier system. United States v. Exxon Corp., 773 F.2d at 1271 n.32. In affirming the decision of the District Court in Exxon I, the Temporary Emergency Court of Appeals stated that the decision in no way affected any rights or responsibilities of other interest owners in the HFU. See id. at 1271. In addition, the January 16, 1990, joint motion for summary judgment filed by the defendants in the Jarvis Christian litigation (and adopted by the Allen parties) recognized as much in stating that "the courts [in Exxon I] explicitly said that Exxon's liability was predicated solely upon its own misconduct and not upon any notion of vicarious liability arising out of obligations owed by other interest owners to the government."

Petitioner argues that "There is no doubt here about the legal enforceability of Exxon's contractual claims for reimbursement of the overpayment of its oil royalties under the provisions of the leases during the price regulation under Texas law." Petitioner's argument represents a dramatic shift from the position taken by the Allen parties in the Jarvis Christian litigation. In count II of its complaint in that litigation, Exxon alleged that the HFU interest owners had breached their contractual obligations to Exxon by refusing to restore the amounts of their overcharges. However, the Allen parties denied any contractual breach on the part of the interest owners and contended that Exxon was not entitled to any recovery from them. The Allen parties also adopted the January 16, 1990, motion for summary judgment and accompanying memorandum filed by the defendants in the Jarvis Christian litigation, which stated that "Exxon mocks the fundamental equitable principles underlying this proceeding by even asking for restitution" of the HFU overcharges.

When claims under a contract are contested, as were Exxon's in the instant case, the claims are not enforceable within the meaning of section 20.2053-4, Estate Tax Regs., until it is eventually determined whether and to what extent the claims have ripened into enforceable claims deductible pursuant to section 2053(a)(3). See Estate of Van Horne v. Commissioner, 78 T.C. at 734; Estate of Taylor v. Commissioner, 39 T.C. at 374-375. On

February 15, 1991, the District Court in the Jarvis Christian litigation issued an order determining in part that the royalty interest owners were liable to Exxon under Federal common law for restitution of overcharges received by them with respect to the misclassified oil. The District Court then referred the calculation of damages to a special master for determination. On February 10, 1992, Exxon and the Allen parties entered into a settlement agreement pursuant to which petitioner agreed to pay Exxon $681,839.60 in settlement of the litigation.

Prior to the District Court's order on February 15, 1991, it was uncertain whether the royalty interest owners had any liability to Exxon.[10] Prior to the settlement agreement on February 10, 1992, the amount, if any, of petitioner's liability pursuant to the District Court's order was also uncertain.[11] Prior to the settlement, petitioner did not accept or acknowledge any liability to Exxon under any of Exxon's theories, and petitioner strenuously resisted Exxon's claims in maintaining

---

[10]Even then, the District Court's determination was subject to appeal.

[11]Indeed, we note that a substantial portion of the amount claimed by Exxon during its settlement conference with the decedent's attorneys in April 1991 represented interest. Exxon was seeking prejudgment interest beginning in February 1975 and postjudgment interest beginning in June 1983 with respect to the amounts it had paid to the Treasury in satisfaction of the judgment in Exxon I. However, in its Feb. 15, 1991, order, the District Court in the Jarvis Christian litigation had determined that Exxon was only entitled to prejudgment interest beginning on Feb. 27, 1986, and ending on the date of judgment in the Jarvis Christian litigation, and thereafter for postjudgment interest.

that it owed Exxon nothing.[12]  Petitioner cannot now switch hats and attempt to show how meritorious Exxon's claims actually were. Instead, the settlement agreement of February 10, 1992, serves as both Exxon's and petitioner's assessment of the value of the now compromised claims.

Petitioner further alleges that certain provisions of the unit and unit operating agreements provided Exxon with an enforceable lien against the Allen parties' interests in the HFU and entitled Exxon to restitution of the overcharges.  Cf. Propstra v. United States, 680 F.2d at 1253-1254.  We disagree. The relevant provisions petitioner refers to address the relationship between Exxon, as operator of the HFU, and the other working interest owners in the HFU.  Thus, neither provision is applicable to the Allen parties who, in contrast, were royalty interest owners in the HFU.  In addition, we note that no provision of the unit operating agreement is applicable to royalty interest owners, as the agreement only addresses the relationship between Exxon and the other working interest owners in the HFU.

We also reject petitioner's attempt to find a lien within the Allen parties' oil and gas leases.  The relevant provision in the leases stated, in pertinent part:

---

[12]For instance, shortly after filing its Federal estate tax return in July 1991, petitioner filed a document with the special master in the Jarvis Christian litigation objecting to Exxon's damage calculations.

> Lessor hereby warrants and agrees to defend the title
> to said land and agrees that Lessee at its option may
> discharge any tax, mortgage or other lien upon said
> land, either in whole or in part, and if Lessee does
> so, it shall be subrogated to such lien with right to
> enforce same and apply rentals and royalties accruing
> hereunder toward satisfying same.  * * *

This provision addresses a situation where the lessor would be responsible for a third-party lien; e.g., where the lessor failed to discharge a tax or mortgage obligation.  Under those circumstances, Exxon, as lessee, would be entitled to satisfy the third-party lien and become subrogated to the third-party's rights against the lessor.  Thus, the provision does not contemplate a situation such as the instant one.  Indeed, we note that in the complaint filed against the interest owners in the Jarvis Christian litigation, Exxon never claimed that the provision was applicable to the litigation.

Finally, petitioner contends that the opinion of the Court of Appeals for the Ninth Circuit in Propstra v. United States, supra, supports its position that it is entitled to a deduction on its Federal estate tax return in the amount claimed.  In Propstra, at the time of his death, the decedent's property had been encumbered by liens of the Salt River Valley Water Users Association (Association) for past due assessments and penalties. The Association's bylaws denied it the power to adjust the claims.  The estate's executrix deducted decedent's one-half share of the liens on the Federal estate tax return.  Twenty-two

months later, the Association's bylaws were amended to permit the settlement of outstanding claims for less than the full amount owed.  The estate ultimately settled the claim for less than the amount originally sought (and reported by the estate on its return).  Id. at 1250.

The Court of Appeals for the Ninth Circuit found that the Association's lien claims were certain and enforceable when the decedent died.  The Court of Appeals noted that at the time of the decedent's death, the Association lacked the authority to settle claims for less than their full amount.  In addition, the estate lacked even a colorable defense against the Association's claims.  The Court of Appeals ruled that "when claims are for sums certain and are legally enforceable as of the date of death, post-death events are not relevant in computing the permissible deduction."  Id. at 1254.  The estate was entitled, therefore, to a deduction for the claim in the amount reported on its estate tax return.

Petitioner's reliance on Propstra is misplaced.  In Propstra, the Court of Appeals explained that the threshold determination to be made under section 2053(a)(3) is whether the claim in question was certain and enforceable at the time of the decedent's death.  See id. at 1253.  The Court of Appeals precluded consideration of postdeath events only where a claim was found to be certain and enforceable on the date of death. Id. at 1254; see also Estate of Van Horne v. Commissioner, 720

F.2d at 1116-1117.  Moreover, the Court of Appeals acknowledged that "The law is clear that post-death events are relevant when computing the deduction to be taken for disputed or contingent claims."  Propstra v. United States, supra at 1253.

The validity and enforceability of Exxon's claim against decedent in the instant case were uncertain as of the date of her death.  As a result, we hold that petitioner's section 2053(a)(3) deduction in connection therewith is limited to the amount ultimately paid in settlement of that claim.  Thus, we sustain respondent's determination.[13]

The next issue for decision is whether the income tax benefit derived by petitioner as a result of the application of section 1341(a) is an asset includable in the gross estate.  Section 2031(a) provides that "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."  Section 2033 provides that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."  In the instant case, the parties have stipulated that all HFU royalties paid to decedent from Exxon for the calendar years 1975

---

[13]Given our disposition of this issue, we need not consider respondent's alternative argument that petitioner must recognize discharge of indebtedness income pursuant to sec. 61(a)(12) in connection with petitioner's settlement of Exxon's claim.

through 1980 were reported as income on her Federal income tax returns for those years and that petitioner is entitled to section 1341(a) relief to the extent that these previously taxed royalties were repaid to Exxon in 1992.

Section 1341(a) provides relief to taxpayers who are forced to repay an amount previously taken into income under a claim of right. The reduction in the taxpayer's tax liability attributable to a repayment is the greater of the amounts calculated under two approaches. Pursuant to the first approach, the taxpayer computes his tax liability for the year of repayment after having deducted the amount of the repayment.[14] Sec. 1341(a)(4). Under the second approach, rather than a deduction in the year of repayment, the taxpayer receives a reduction (i.e., a credit) in his tax liability for the year of repayment which is equal to the reduction in tax that would have occurred for the prior year had the amount received under a claim of right been excluded from income. Sec. 1341(a)(5). If the reduction in tax under the second approach is greater than the taxpayer's income tax liability for the year of repayment, the excess is refundable or credited just as with any overpayment of tax. Sec. 1341(b)(1).[15]

---

[14]The amount of the deduction to which the taxpayer is entitled as a result of a repayment must exceed $3,000. Sec. 1341(a)(3).

[15]Petitioner concedes that the computation of its sec.
(continued...)

On brief, petitioner contends that the gross estate is not increased by the amount of its section 1341(a) relief, because decedent's right to such relief did not exist at the time of her death on November 16, 1990. Petitioner maintains that it was not entitled to any section 1341(a) relief until it repaid Exxon pursuant to the terms of the February 10, 1992, settlement agreement. This agreement was not entered into until almost 15 months after decedent's death. Respondent, on the other hand, argues that petitioner's section 1341(a) relief necessarily augments the gross estate. Neither party has cited, nor have we found, any case law squarely on point.

In support of his position, respondent relies on the decision of the District Court for the Eastern District of Michigan in Estate of Good v. United States, 208 F. Supp. 521 (E.D. Mich. 1962). In Estate of Good, the decedent had been overpaid by his employer in salary and expense reimbursements. These amounts were reported by decedent on his income tax returns for the years received. The employer notified the decedent that he would be liable for repayment and filed a claim against the decedent's estate when the decedent died prior to repayment.

---

[15](...continued)
1341(a) relief is limited to the amount paid to settle Exxon's claim against decedent individually; petitioner is not entitled to sec. 1341(a) relief for amounts paid in satisfaction of Exxon's claims against Jessamine and Frankie. The parties also appear to agree that a credit pursuant to sec. 1341(a)(5) would provide petitioner a greater benefit than a deduction under sec. 1341(a)(4).

After the estate repaid the employer, it claimed a deduction on its Federal estate tax return, as well as a credit pursuant to section 1341(a)(5) on its fiduciary income tax return. In the Commissioner's view, because the decedent and his estate were separate taxpayers, section 1341(a) relief was unavailable. See Rev. Rul. 67-355, 1967-2 C.B. 296, revoked by Rev. Rul. 77-322, 1977-2 C.B. 314.

The District Court rejected the Commissioner's argument and concluded that section 1341(a) relief was appropriate. The District Court analyzed the estate and income tax consequences that would have resulted had the decedent repaid the amount in issue prior to his death. The District Court explained that the gross estate would have been decreased by the amount repaid and increased by the amount of the section 1341(a) credit to which the estate was entitled. Estate of Good v. United States, supra at 522. Since both parties acknowledged that the section 1341(a) credit, if available, would increase the gross estate, the District Court found that the Government would "not [be] prejudiced in the collection of the estate tax by the estate's claiming both an estate tax deduction and an income tax credit on the same transaction." Id. at 523.

The District Court in Estate of Good reasoned that the provisions of section 1341(a) should be available to an estate in order to ensure the same income tax consequences regardless of whether a taxpayer repays income prior to his death or the estate

makes the restoration after his death.[16]  Similarly, in the
instant case, the relevant estate tax consequences should not
vary where the estate, rather than decedent, makes the payment
upon which section 1341(a) relief is predicated.[17]  The right to
section 1341(a) relief clearly would have been includable in the
gross estate had Exxon's claim been settled and paid prior to
decedent's death.  We see no reason why decedent's "contingent"
right to section 1341(a) relief should not be included in her
gross estate.[18]

---

[16]The District Court stated:  "when Congress passed Section
1341 it did not intend to recognize a debt of the Government to
the taxpayer during his lifetime and deny the same obligation to
his personal representatives and to his estate."  Estate of Good
v. United States, 208 F. Supp. 521, 523 (E.D. Mich. 1962); see
also Nalty v. United States, 35 AFTR 2d 75-1449, 75-1 USTC par.
9441 (1975); Estate of Stein v. Commissioner, 37 T.C. 945, 958
(1962).

[17]While we recognize that the parties in Estate of Good v.
United States, supra at 523, agreed that the gross estate would
be increased by the amount of any sec. 1341(a) relief, we
nevertheless find the reasoning in the District Court's opinion
persuasive.

[18]In United States v. Simmons, 346 F.2d 213, 214 (5th Cir.
1965), the decedent paid a deficiency in his Federal income
taxes, and the attorney for his estate filed a claim for refund
following his death.  After the refund claim was disallowed, the
estate filed suit.  The refund litigation was eventually settled,
and a refund was paid.  In the interim, the estate had filed its
estate tax return listing the income tax claim as having no value
but requesting that the estate tax liability be held in abeyance
pending the outcome of the claim.  The Commissioner determined
that the claim was includable in the decedent's estate and valued
the claim at the amount of the settlement.  Although the estate
conceded that the claim was includable in the gross estate, it
contended that the claim had no value at the time of the
decedent's death.

(continued...)

In Estate of Curry v. Commissioner, 74 T.C. 540, 544 (1980), the decedent, who was an attorney, executed an agreement with another attorney, which provided that the decedent would receive a stated percentage of any attorney's fees that might be awarded in a list of docketed cases pending before the Indian Claims Commission (Commission). Any award of attorney's fees in these cases was contingent upon an ultimate recovery on behalf of the plaintiffs and would be measured by the extent of the recovery. At the time of the decedent's death, 13 of the cases remained in various unresolved stages of litigation before the Commission. Following the decedent's death, the estate received attorney's fees in connection with this litigation. The Commissioner determined that the contractual right to share in future attorney's fees was an interest in property includable in the decedent's gross estate.

In Estate of Curry v. Commissioner, supra at 545, the taxpayer argued that the contingent legal fees were not

---

[18](...continued)
    After trial, the District Court submitted the issue of valuation to the jury, which found that the claim had no value at the time the decedent died. The Court of Appeals for the Fifth Circuit reversed, holding that there was no rational basis for the jury's finding. The Court of Appeals stated: "When * * * [the decedent] died, his 'property' included the claim for refund of federal income taxes." Id. at 215. The Court of Appeals determined that postdeath facts and circumstances were to be taken into account for purposes of valuing the estate's claim and found the amount for which the claim was eventually settled to be "highly indicative", but not determinative, of such value. Id. at 218.

includable in the gross estate, because the decedent was not entitled to any fees at the time of his death; i.e., any fees were contingent upon events that had not yet occurred as of the date of death. We explained:

> The fact that the legal fees we are concerned with were contingent upon future recovery * * * is a critical consideration in trying to determine what the contract right was worth as of the date of death. However, the contingent nature of the contract right must bear on the factual question of valuation. It cannot, as a matter of law, preclude the inclusion of the interest in the decedent's gross estate or command that the value be fixed at zero. Although uncertainty as to the value of a contract right may postpone the inclusion of the income until it is actually realized for income tax purposes, for estate tax purposes, the value of an asset must be determined in order to close the estate. * * * [Id. at 546-547.]

This analysis is equally applicable to a contingent statutory right to relief under section 1341(a). In the instant case, the right to section 1341(a) relief was contingent at the date of decedent's death. The contingency centered on decedent's dispute over Exxon's claim. However, the fact that this right to relief was contingent does not prevent its inclusion in the gross estate. See United States v. Simmons, 346 F.2d 213, 215 (5th Cir. 1965); Estate of Curry v. Commissioner, supra at 545-547.

The facts giving rise to petitioner's section 2053(a)(3) deduction and its right to section 1341(a) relief are inextricably linked. At the time of decedent's death, Exxon was claiming that decedent was obligated to repay royalties, which

decedent had previously reported as taxable income. Therefore, at the time of her death, decedent had statutory rights pursuant to section 1341(a) to receive tax benefits based on whatever amount she ultimately had to pay Exxon. Petitioner is entitled to an estate tax deduction in the amount paid to satisfy Exxon's claim, as well as section 1341(a) relief for payment of the same claim. Exxon's claim decreases the estate's assets while the right to section 1341(a) relief increases the estate's assets. Under these circumstances, it would be inappropriate to consider one in the determination of the taxable estate while excluding the other.

The amount for which a claim is ultimately settled is evidence of its value. See United States v. Simmons, supra at 218 (finding the amount for which a claim was eventually settled to be "highly indicative" of the value of the claim). In the instant case, there was no evidence introduced to show that the value of the contingent right to section 1341(a) relief at decedent's death was less than the amount that will actually be received. On brief, petitioner confined its argument to whether the contingent right to section 1341(a) relief was or was not an asset includable in the gross estate. Petitioner did not argue that, in the event we find the right to section 1341(a) relief includable in the gross estate, the value of this right for estate tax purposes is anything less than the amount of the benefit ultimately received.

For the foregoing reasons, we hold that the taxable estate must be increased by the amount of section 1341(a) relief that is attributable to the amount petitioner paid to Exxon in settlement of its claim.

<u>Decision will be entered under Rule 155 in docket No. 19200-94</u>.

<u>Decision will be entered for petitioner in docket No. 3976-95</u>.