ESTATE OF JAMES E. CURRY, DECEASED, AILEEN CURRY-CLOONAN AND BEULAH BULLARD, COEXECUTRICES, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9502–76.    Filed June 9, 1980.

*Landon Gerald Dowdey* and *Peter A. Noterman,* for the petitioners.*

*Marguerite F. Gramza,* for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency in estate tax of $163,526.54 against petitioner, the Estate of James E. Curry. Concessions having been made by both parties, the remaining issue for our decision is whether the value of the decedent's interest in certain contingent legal fees pertaining to litigation still in progress as of the date of death should be included in his estate under section 2033.[1] If we find that the interest is includable in the estate, we must then ascertain the value of the interest.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and the attached exhibits are incorporated

---

*John L. Tully, Jr., was counsel of record for the petitioners at the time of trial. Mr. Tully died on May 28, 1978, shortly after the trial.

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue.

herein by this reference. A summary of the pertinent facts in this case is set forth below.

At the time of the filing of this petition, executrix Aileen Curry-Cloonan (hereinafter referred to as Ms. Curry-Cloonan) resided in Washington, D.C. Executrix Beulah Bullard (hereinafter referred to as Ms. Bullard) also resided in Washington, D.C. Ms. Curry-Cloonan and Ms. Bullard are the coexecutrices of the Estate of James E. Curry.

James E. Curry (hereinafter referred to as Mr. Curry, or, the deceased) died on August 23, 1972. An estate tax return was filed with the District Director, Internal Revenue Service, Philadelphia, Pa., in July 1973. Mr. Curry executed a will on August 4, 1972 (hereinafter referred to as the will), which was admitted to probate on November 1, 1972, in the United States District Court for the District of Columbia. The attorney representing the estate at the time of probate and at all relevant times was Landon G. Dowdey (hereinafter referred to as Mr. Dowdey), a longtime acquaintance of the deceased.

During his lifetime, Mr. Curry was an attorney who at one time had been active in prosecuting the claims of American Indian tribes before the Indian Claims Commission (hereinafter referred to as the Commission). Throughout the 1940's and early 1950's, Mr. Curry entered into many contracts with different groups of Indians in which he agreed to represent them before the Commission. Most of the contracts provided for payment on a contingent fee basis, the fee to be calculated as a percentage of any eventual recovery made by the tribes. In the 1950's, Mr. Curry suffered an attack of polio which rendered him unable to engage in the active practice of law. Consequently, the original contracts between Mr. Curry and various Indian tribes were replaced by new contracts between the tribes and other attorneys during the 1950's and early 1960's. One of these attorneys was I. S. Weissbrodt (hereinafter referred to as Mr. Weissbrodt).

In 1966, Mr. Curry entered into a written agreement with Mr. Weissbrodt with respect to Mr. Curry's right to share in fees in a group of docketed Indian claims cases which were still before the Indian Claims Commission. The agreement provided that Mr. Curry would receive a stated percentage, ranging from 18 percent to 24 percent, of any attorney's fees that might be awarded in the listed cases. When Mr. Curry died, 13 of the cases

listed in the agreement were in various uncompleted stages of litigation.

In the will executed shortly before his death, Mr. Curry specifically revoked a prior will and named his daughter (Ms. Curry-Cloonan) and a friend (Ms. Bullard) as residuary beneficiaries, to share equally in the residue of his estate. In addition, Mr. Curry stated in the will that certain survivorship provisions in various joint bank accounts, savings accounts, and Government bonds were revoked, thereby attempting to put the proceeds of these accounts in his estate.

Conflict occurred between the two beneficiaries. Ms. Curry-Cloonan considered attacking the second will executed by her father. In addition, there was a problem concerning the rights of the Estate of James E. Curry (hereinafter referred to as the estate) in coowned Government bonds and joint accounts. Originally, Mr. Dowdey considered the coowned bonds as part of the estate and wrote letters to the owners requesting transfer of the bonds to the estate. Subsequently, he discovered that the bonds in fact belonged to the surviving coowners, but that there might be a possibility of offsetting some of the legacies with the proceeds of the bonds. In order to resolve the various disputes between Ms. Curry-Cloonan and Ms. Bullard and to accomplish what he felt was a strong personal desire on the part of Ms. Curry-Cloonan to terminate a continuing relationship with Ms. Bullard, Mr. Dowdey presented a proposal to the two women in the spring of 1973, under which their respective interests in the residue of Mr. Curry's estate were settled. Pursuant to the agreement, executed on June 1, 1973, Ms. Bullard assigned her right to one-half of any future recoveries in the remaining 11 Indian claims cases to Ms. Curry-Cloonan in exchange for Ms. Curry-Cloonan's agreement to have certain assets owned in joint ownership brought into the estate.

The Indian Claims Commission was created in 1946 under the Indian Claims Commission Act, Pub. L. 79–726, 60 Stat. 1049, 25 U.S.C. sec. 70 (hereinafter referred to as the act), in order to reduce the large residue of Indian claims which had occurred prior to August 13, 1946. Under the act, all claims had to be filed before the Commission prior to August 31, 1951. Most cases filed before the Commission sought compensation for the taking of lands. The land cases normally are tried in three phases: title, value, and offsets. In the title phase, the Indian plaintiffs must

show that they had a compensable interest in the land which is the subject matter of the suit. This means that the tribe must show that it held aboriginal title based on continuous occupancy and use for a long time prior to the date it was taken. In the second phase, the fair market value of the land, as of the date of taking, is established, and the value of any consideration, which was often in the form of goods and services, is also established. If the Commission finds that the United States is liable in the second phase of the suit, an interlocutory order is entered awarding the Indian tribe a fixed amount, subject to any allowable offsets. Allowable offsets normally consisted of gifts of property or money for the benefit of the Indian tribe which were made voluntarily by the United States. Either party may appeal to the U.S. Court of Claims from an interlocutory determination establishing the liability of the United States, as well as from any final determination.

The act provided that during the period when claims could be filed, identifiable groups of Indians could contract with attorneys to represent them in their claims before the Commission. These contracts could stipulate the amounts to be paid in the event of recovery. Absent such contract, the Commission would set the contingent fees in these cases. However, in no event could the amount of fees exceed 10 percent of the amount recovered.

Often, cases are disposed of by way of compromise settlement after the first or second phase of the litigation. Any proposed settlement of an Indian claim must be approved by the Bureau of Indian Affairs, the Department of the Interior, and the Department of Justice, as well as by the tribal leaders and tribal membership. After the settlement is approved by all the parties, the Commission holds a formal hearing on the matter in which it accepts or rejects the settlement. Thereafter, the attorneys petition the Commission for their fee award. After comment by the Justice Department, the Bureau of Indian Affairs, and the Department of the Interior, the Indian Claims Commission must approve the award of attorney's fees, or if the amount is not fixed by contract, must determine the final award.

Four months after the date of death, in December of 1972, the estate received its share of attorney's fees in 2 of the 13 pending cases, docketed as 22–D and 22–J, in the amount of $100,544.40. As of the date of death, these two cases had reached the point of

an agreement between the parties for a compromise settlement, but the settlement had not been approved by the Commission, nor had an award of attorney's fees been applied for. The estate's share of the fees for these two cases was reported as income by the estate on its income tax return. Three years after the date of death, in May and June of 1975, an award of attorney's fees was made in two more cases, docketed as 278–B and 186. The estate's share of the fees, which were $1,296 and $15,241, respectively, was placed in escrow with Mr. Weissbrodt subject to certain unresolved claims. The unresolved claims involved an indemnity claim arising out of a lawsuit filed against Mr. Weissbrodt in Alaska for $67,000 due on account of an alleged fee-sharing agreement with Mr. Curry and claims for nonreimbursed expenses and costs incurred by Mr. Weissbrodt in cases in which Mr. Curry had an interest. In February of 1976, an award of attorney's fees was made in another case docketed as 87–B, and the estate's share of the fees, $144,000, was placed in escrow subject to the same unresolved claims. Five years after the date of death, in the latter half of 1977, the estate received the sum of $150,000 as its share of attorney's fees in another case docketed as 22–C. This amount was received after the payment of certain third-party claims. On April 10, 1978, a compromise agreement was reached concerning the sums held in escrow. Under the agreement, Mr. Weissbrodt paid $133,500, including accumulated interest to Ms. Curry-Cloonan, and released his indemnity claim against her in the three matters of concern. In the remaining 7 of the 13 claims which were pending at the date of death, no recovery had been made by the Indian tribes at the time this case was tried, and consequently, there had been no award of attorney's fees.

## OPINION

In 1966, the decedent executed an agreement with another attorney which provided that the decedent would receive a stated percentage of any attorney's fees which might be awarded in a list of docketed cases pending before the Indian Claims Commission. Any award of attorney's fees in the cases was contingent upon an ultimate recovery on behalf of the plaintiff tribal members and would be measured by the extent of the recovery. When Mr. Curry died in 1972, 13 of the cases were still in various unresolved stages of litigation before the

Commission. The issue for our decision is whether the contractual right to share in contingent attorney's fees with regard to these 13 pending cases is property which must be valued and included in the decedent's gross estate. Petitioners argue that because the decedent's right to share in the attorney's fees was not compensable as of the date of death, i.e., that because by their very nature, contingent fees do not accrue until a final judgment is rendered, the decedent's interest in the fees had no market value when he died. Respondent contends that the contractual right to share in future attorney's fees is an interest in property includable in the decedent's gross estate, and that notwithstanding the contingent nature of the fees, the decedent's interest had substantial value on the date of death. We agree with respondent that the contractual right is includable in the gross estate, although we disagree somewhat with his methodology in valuing the interest.

### Issue 1. Includability of Contingent Legal Fees in the Gross Estate

First, we deal with the contention that as a matter of law, contingent legal fees are not includable in the gross estate because there is no compensable interest as of the date of death. We find nothing in the statute to sustain such a proposition. Section 2031[2] provides that the value of the gross estate shall be determined by including the value of all property, real or personal, tangible or intangible. Section 2033[3] provides that the value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent. As used in the statute, the term "property" encompasses all choses in action, including claims for services performed. *Estate of McGlue v. Commissioner*, 41 B.T.A. 1199 (1940). A right of a deceased partner to share in future profits of the partnership is an

---

[2]Sec. 2031(a) reads as follows:

SEC. 2031. DEFINITION OF GROSS ESTATE.

(a) GENERAL.—The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.

[3]Sec. 2033 reads as follows:

SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

interest in property, includable in the gross estate. *Estate of Hull v. Commissioner*, 38 T.C. 512 (1962), revd. on another issue 325 F.2d 367 (3d Cir. 1963); *Estate of Riegelman v. Commissioner*, 27 T.C. 833 (1957), affd. 253 F.2d 315 (2d Cir. 1958). The date-of-death values of existing claims of the decedent which pass to his estate are includable in the gross estate. *Bank of California v. Commissioner*, 133 F.2d 428 (9th Cir. 1943), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; *United States v. Simmons*, 346 F.2d 213 (5th Cir. 1965).

In *Duffield v. United States*, 136 F. Supp. 944 (E.D. Pa. 1955), the deceased was an attorney who represented three persons who were among thousands claiming to be the heirs of a large estate. By contract, it was provided that the attorney would receive a percentage of any recovery made on behalf of his clients upon completion of the litigation. The attorney died before the court gave judgment for his clients as the heirs of the estate, and the executor placed a value of zero on the attorney's contingent fee arrangement. In denying the plaintiff's motion for summary judgment in a suit for an estate tax refund, the court held that the evidence did not establish that the contracts were valueless as a matter of law. Rather, a factual issue was raised as to their values on the date of death.[4]

The fact that the legal fees we are concerned with were contingent upon future recovery by the Indian tribes is a critical consideration in trying to determine what the contract right was worth as of the date of death. However, the contingent nature of the contract right must bear on the factual question of valuation. It cannot, as a matter of law, preclude the inclusion of the interest in the decedent's gross estate or command that the value be fixed at zero. Although uncertainty as to the value of a

---

[4]Petitioners rely on two Memorandum Opinions of this Court, *Estate of Nemerov v. Commissioner*, T.C. Memo. 1956–164, and *Estate of Crail v. Commissioner*, a Memorandum Opinion dated June 30, 1942, to support their position that contingent legal fees not compensable at the time of death have no market value. However, Memorandum Opinions of this Court relate to the specific facts and circumstances surrounding the parties who are then before the Court. *Nemerov*, having been issued as a Memorandum Opinion, turns on its facts and certainly does not establish a rule of law that contingent legal fees are, simply by virtue of their contingency, automatically excluded from the gross estate. And unlike *Nemerov*, the decedent herein had a contractual right with the attorneys doing the work to a specified portion of the legal fees ultimately recoverable. Neither is *Estate of Crail* authority for any such rule of law. Nothing in either of these Memorandum Opinions or in any precedents that we have found convinces us that such a bald proposition has been or should be adopted. See *Duffield v. United States*, 136 F. Supp. 944 (E.D. Pa. 1955).

contract right may postpone the inclusion of the income until it is actually realized for *income* tax purposes, for *estate* tax purposes, the value of an asset must be determined in order to close the estate. See *Burnet v. Logan*, 283 U.S. 404, 412 (1931). Compare *Estate of McGlue v. Commissioner*, 41 B.T.A. 1186 (1940), revd. 119 F.2d 167 (4th Cir. 1941), with *Estate of McGlue v. Commissioner*, 41 B.T.A. 1199 (1940). We therefore hold that, under the circumstances before us, the contractual right herein to share in future attorney's fees which are contingent in nature, is property to be included in the decedent's gross estate under section 2033.

## Issue 2. Valuation of the Contract Right

We must next address the factual issue of the value at the date of death of the contractual right to share in contingent attorney's fees for the 13 cases then pending before the Indian Claims Commission. The regulations under section 2031 provide:

(b) *Valuation of property in general.* The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death * * * . The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. * * * [Sec. 20.2031–1(b), Estate Tax Regs.]

First of all, we must reject petitioner's contention that because the claims here involved had not been reduced to judgment, they were too remote and speculative to be valued. Valuation for estate tax purposes frequently involves difficult and somewhat imprecise calculations. See *Estate of Smith v. Commissioner*, 57 T.C. 650 (1972), affd. 510 F.2d 479 (2d Cir. 1975). However, uncertainties and difficulties encountered in determining value have never been considered justifications for obviating this necessary task. See *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929), and *Estate of Smith v. Commissioner*, *supra*. Approximately half of the cases listed in the agreement executed between Mr. Weissbrodt and Mr. Curry in 1966 were reduced to judgment by 1972, the year in which Mr. Curry died.

These cases resulted in substantial awards of attorney's fees. Although there are distinctions between the cases decided prior to 1972 and some of the cases still pending as of the date of death, it is clear that the contractual right to share in any future award of attorney's fees for this kind of litigation had substantial value when the decedent died.[5]

Respondent asserts that the value of the contract right as of the date of death is $260,444. He arrives at this figure by adding two distinct sums. First, he valued the right to fees in two of the docketed cases (22–D and 22–J) as the amount of income, $100,544, which actually was paid to the estate for these two cases 4 months after the date of death. In order to value the 11 other cases, he took the compromise agreement executed between the two residuary beneficiaries in which Ms. Bullard assigned her right to one-half of any future recoveries in the 11 cases to Ms. Curry-Cloonan in exchange for Ms. Curry-Cloonan's agreement to arrange to have certain joint ownership bonds and bank accounts brought into the estate. Respondent reasons that since the result of this arrangement was to benefit Ms. Bullard in the amount of $79,950,[6] one can double that figure to arrive at the value of an undivided right to share in the 11 pending cases. By adding the income for the 2 cases which were completed shortly after Mr. Curry's death with the computation of the value of the 11 other cases, respondent concludes that the date-of-death value of the entire contract right is $260,444.

Although appealing because of the simplicity, we must reject respondent's methodology in valuing the contract right of the decedent. With regard to the first two docketed cases (22–D and 22–J), respondent has erred in failing to distinguish between a contractual right to receive future income and the actual receipt of the income subsequent to the date of death. *Bull v. United States*, 295 U.S. 247 (1935); *Estate of Hull v. Commissioner*, 38 T.C. 512 (1962), revd. on another issue 325 F.2d 367 (3d Cir. 1963).

---

[5]Indeed, Mr. Dowdey, the attorney for the estate, testified at trial that he never considered this right to share in future fees not to be a valuable asset of the estate. He simply felt that the fees were too speculative to place a definitive value on the contract right.

[6]Petitioners object, under rule 408 of the Federal Rules of Evidence, to respondent's use of the compromise agreement and of Mr. Dowdey's correspondence during negotiations to prove the value of the contract right. However, in light of our determination that the compromise agreement is not indicative of the economic value of the contract right, we decline to rule on the issue of its exclusion under rule 408.

In addition, we do not share respondent's view that the "sale" of Ms. Bullard's right to receive half of any future attorney's fees in the remaining 11 cases fits neatly into the "willing seller, willing buyer" criteria of the regulations. It seems clear from the record that the agreement was drawn up by Mr. Dowdey and accepted by the residuary beneficiaries primarily for reasons apart from economic considerations. Mr. Dowdey realized he had made a serious mistake in advising the residuary beneficiaries that the joint ownership bonds and accounts were to be part of Mr. Curry's estate and in his initial attempt to collect the bonds from the surviving owners. In addition, it is clear that he was guided by a strong desire on the part of one of the beneficiaries, Ms. Curry-Cloonan, to avoid being locked into a continuing relationship with Ms. Bullard at any cost,[7] and by many other personal considerations of both women. The agreement appears to us to be a carefully orchestrated solution to most of the problems confronting those involved with the estate—not a disinterested sale between a willing buyer and a willing seller, both having knowledge of the relevant facts. Therefore, we do not consider the compromise agreement as indicative of the economic value of the contract right as of the date of death, and we disregard it in valuing the right.

Clearly, there is no way to value with exactness a contractual right to share in attorney's fees for 13 Indian claims cases, all of which were in various stages of litigation when Mr. Curry died. However, respondent produced an expert witness (Mr. Webb) who elucidated the procedures of the Indian Claims Commission and gave helpful testimony as to the three broad characteristics of cases covered by the agreement (land, accounting, and damages) and the general potential for recovery in each classification. In addition, the parties submitted voluminous exhibits relating to each of the separate claims, which we have examined with great care.

It must be remembered, however, that we are not estimating the potential amount of recovery of the underlying claims in general, but rather the contractual right to share in a percentage (18 percent to 24 percent) of a percentage (usually 10

---

[7] Mr. Dowdey testified at trial that the only item which would require a continuing relationship between the two women as residuary beneficiaries of the estate was the right to future fees from the Indian claims cases.

percent) of any recovery on behalf of specific clients. The two most critical factors in valuing the contract right are the classifications of the cases still pending and the stage to which each had progressed. For instance, Mr. Webb testified that the land cases had by far the best potential for recovery on behalf of the tribes. Of the 13 cases, 4 were land cases. However, Mr. Webb also testified that accounting and damage cases, of which the other nine cases were comprised, were much more problematic. It was not at all clear how the Indian Claims Commission would react to these claims, and Mr. Webb was hesitant to try to set any value on them because of the uncertainty and the substantial delay in their resolution.[8]

Among the land cases, the stage to which each had proceeded is important in setting a value as of August 23, 1972, the date of death. For example, the two cases for which the estate recovered $100,544.40 4 months after the date of death were substantially complete, at least as far as the real issues were concerned. Title had been determined, liability had been set, and a compromise settlement had been approved by the parties. The remaining steps—approval by the Commission of the settlement, and application to and approval by the Commission of attorney's fees—are basically pro forma steps.

However, the other land cases were in some aspects less promising, at least in terms of the estate's receiving a share of the attorney's fees. While we recognize that the estate ultimately received substantial attorney's fees in one land case ($150,000), the potential for recovery in even this case was clouded by several factors at the date of death. For, while it was clear that some tribe or a group of tribes was going to make a substantial recovery in this case, it was not clear which tribes these were going to be in 1972. Many tribes had intervened in the suit, and title to and the boundaries of the land were not determined until 1975. Therefore, although the potential for some recovery was good, it was not at all clear how much of the recovery might eventually accrue to Mr. Curry's estate.

Additionally, as noted earlier, recovery of attorney's fees in the damage and accounting cases was subject to several contingencies at the date of death, the date critical to our

---

[8]Of the nine accounting and damage cases, seven were still pending before the Commission or the Court of Claims as of this trial.

inquiry. And even though the estate ultimately recovered substantial legal fees in one of the damage cases, we note that seven of the damage and accounting cases were still pending at the date of trial, and all of these cases must be viewed in the light of the circumstances existing on August 23, 1972, the date of death.

Additional relevant considerations in valuing, on August 23, 1972, the contractual right to share in a percentage of future attorney's fees are: Mr. Weissbrodt's past successes as a prosecuting attorney for the tribes; the delays involved in this kind of litigation; and the fact that there were claims by other attorneys on Mr. Curry's share of the fees except for the first two awards, which were made shortly after his death.

After a careful consideration of the entire record before us, we find that the date-of-death value of the contractual right to share in the attorney's fees for the two land cases (22–D and 22–J) which were substantially completed and not subject to competing claims was $95,000.

The date-of-death value of the right to share in the attorney's fees for the remaining 11 cases presents a more difficult problem. We have carefully evaluated the nature and the type of cases involved in the light of the expert testimony received, the stage of the litigation at the date of death, Mr. Weissbrodt's experience and past successes in this relatively esoteric area, the impact of delay so characteristic of Indian Claims litigation, and the possibility of competing claims for some of the fees. We recognize that, while there were ultimately substantial awards in some instances, in estimating the *date-of-death value* of these claims, we must be satisfied with some imprecision. But inexactitude is often a byproduct in estimating claims or assets without an established market and provides no excuse for failing to value the claims before us in the light of the vicissitudes attending their recovery. In the light of all the factors we have enumerated as of the date of death, August 23, 1972, and considering that critical issues were still unresolved, we conclude that the date-of-death value of the remaining 11 cases was $70,000. Therefore, the amount includable in the decedent's estate under section 2033 is $165,000.

*Decision will be entered under Rule 155.*