T.C. Memo. 2011-95

UNITED STATES TAX COURT

ESTATE OF ELLEN D. FOSTER, DECEASED, ASHLEY BRADLEY AND TARA
SHAPIRO, CO-EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16839-08.                    Filed April 28, 2011.

D. Douglas Metcalf, George L. Paul, and Hope E. Leibsohn,
for petitioners.

Christopher J. Sheldon and Shad M. Brown, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined a deficiency in the
Federal estate tax of the Estate of Ellen D. Foster (the estate)
of $4,749,722.  By amended answer, respondent asserts an
increased deficiency of $14,637,722.

After concessions, the issues for decision are: (1) Whether the estate is entitled to discount the value of certain assets in the gross estate; (2) the value of claims held by the estate; and (3) whether the estate is entitled to deduct its actual litigation expenses for those claims.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Ellen Foster (decedent) resided in Arizona at the time of her death. Ashley Bradley and Tara Shapiro (coexecutors) were appointed coexecutors of the estate, and they also resided in Arizona at the time the petition was filed.

Decedent's husband, Thomas S. Foster (Mr. Foster), founded Foster & Gallagher, Inc. (F&G), in 1951. F&G was in the mail-order horticulture business and relied heavily on a sweepstakes program as part of its direct mail advertising.

In 1991, Mr. Foster and F&G entered into a stock restriction agreement (SRA) which required F&G, upon the deaths of decedent and Mr. Foster, to purchase all of the F&G stock held by Mr. Foster's family group (family group). To ensure that F&G had the

money to do so, the SRA required F&G to maintain life insurance on the joint lives of decedent and Mr. Foster, payable after both had died. F&G accordingly purchased and maintained $50 million of paid-up life insurance (the life insurance). The SRA prohibited F&G from borrowing against the cash surrender value of or otherwise encumbering the life insurance and gave decedent or Mr. Foster the right to purchase the life insurance if the family group disposed of its F&G stock. Kavanagh, Scully, Sudow, White & Frederick, P.C. (Kavanagh), represented both Mr. Foster and F&G in the negotiation and drafting of the SRA.

In 1995, Mr. Foster and several other shareholders of F&G decided to sell the majority of their stock to F&G's employee stock ownership plan (ESOP). In order to finance the ESOP's purchase of that stock (ESOP transaction), F&G borrowed approximately $70 million on an unsecured basis (the ESOP loans) from four institutional lenders (ESOP transaction lenders) and lent the proceeds to the ESOP. In connection with the ESOP transaction, F&G hired U.S. Trust Company, N.A. (U.S. Trust), as the ESOP's new trustee, and Mr. Foster agreed to indemnify U.S. Trust against any loss arising from any misrepresentation or breach of duty committed by Mr. Foster. On December 20, 1995, the ESOP purchased 3,589,743 shares of F&G common stock at $19.50 per share. Mr. Foster received $33,120,789 for the 1,698,502 F&G shares that he sold. Mr. Foster transferred the stock sale

proceeds along with his remaining F&G stock to the Thomas S. Foster Revocable Trust (Foster Trust).

Mr. Foster died on July 11, 1996. Upon his death, the Foster Trust was divided into three trusts: Marital Trusts #1, #2, and #3 (collectively, the Marital Trusts). Decedent was the sole income beneficiary of the Marital Trusts during her life and could withdraw any part of the principal of Marital Trust #3 at any time. The trust instrument appointed Northern Trust Company (Northern Trust) and decedent cotrustees of the Marital Trusts and gave them the discretion to invade the principal for decedent's benefit.

In 1998, F&G began experiencing financial trouble on account of negative publicity surrounding sweepstakes advertising strategies such as the one F&G employed. F&G's revenues and earnings steadily declined, causing F&G to be in violation of the financial covenants of the ESOP loans. Because the ESOP loans were unsecured, the ESOP transaction lenders (which included Northern Trust) sought to restructure the loans to gain a security interest in F&G's assets.

In February 1999, Northern Trust, as co-trustee of the Marital Trusts, waived the SRA's restrictions and allowed F&G to borrow against the cash surrender value of the life insurance. In September 1999, Northern Trust again waived the SRA prohibition against encumbrance and assigned itself the life

insurance as collateral for the ESOP loans. F&G also demanded that decedent lend F&G approximately $6.8 million (the Founder's Loan). In order to make the Founder's Loan, decedent borrowed $6.8 million from Northern Trust, securing the loan with over $12 million worth of assets that she withdrew from Marital Trust #3. Kavanagh represented and advised both decedent and F&G in connection with all three of these transactions (the 1999 transactions).

As a result of F&G's borrowing on the cash surrender value of the life insurance, the life insurance ceased to be self-funding. F&G filed for bankruptcy on July 2, 2001, and the life insurance ultimately lapsed when F&G failed to pay the premiums.

On April 6, 2001, just before F&G's bankruptcy filing, beneficiaries of the ESOP (the ESOP plaintiffs) filed suit (the Keach lawsuit) in the U.S. District Court for the Central District of Illinois alleging breaches of fiduciary duty committed by U.S. Trust and Mr. Foster (with decedent named as a defendant as executrix of Mr. Foster's estate) in connection with the ESOP transaction. The ESOP plaintiffs also sought restitution against decedent and Northern Trust as cotrustees of the Marital Trusts and requested the imposition of a constructive trust over the assets held by decedent as executrix of Mr. Foster's estate and co-trustee of the Marital Trusts. Kavanagh represented decedent in the Keach lawsuit as well.

To avoid potential liability to the ESOP plaintiffs for distributions from the Marital Trusts, Northern Trust unilaterally froze decedent's right to withdraw the principal of Marital Trust #3. However, despite the freeze, some of the assets of Marital Trust #3 were sold at undiscounted prices.

On March 5, 2003, the District Court granted summary judgment to decedent as executrix of Mr. Foster's estate because his estate was closed and therefore no judgment could be enforced against her in that capacity. The District Court did leave open the possibility that the ESOP plaintiffs could proceed with their restitution claim against decedent as co-trustee of the Foster Trust if the ESOP plaintiffs could establish that Mr. Foster had committed a breach of fiduciary duty. However, on February 12, 2004, the District Court entered an order finding, among other things, that Mr. Foster and U.S. Trust had committed no such breach. The District Court entered a judgment on March 8, 2004, and an amended judgment on April 23, 2004, in favor of all of the defendants.

On April 9, 2004, the ESOP plaintiffs appealed to the Court of Appeals for the Seventh Circuit. Decedent died on May 15, 2004, while that appeal was pending. On September 27, 2004, coexecutors, as successor cotrustees of the Marital Trusts, entered into a settlement agreement whereby the ESOP plaintiffs

released their claims against the estate.  On August 17, 2005, the Court of Appeals affirmed the District Court's judgment.

Shortly after decedent's death, coexecutors met with Kavanagh and Northern Trust on May 27, 2004, to discuss the administration of the estate.  Coexecutors were not informed of the existence and lapse of the life insurance.

On June 4, 2004, upon being appointed coexecutors of decedent's estate, coexecutors hired the law firm Lewis and Roca, LLP (L&R), to handle the probate of the estate.  During the course of administering the estate, coexecutors came to believe that the work Kavanagh had done in planning decedent's estate and in representing decedent in the Keach lawsuit had been deficient. By September 22, 2004, L&R had identified and begun investigating potential claims against Kavanagh.  By October 2004, coexecutors had stopped paying Kavanagh's legal fees.  On November 12, 2004, L&R discovered that the life insurance had lapsed during F&G's bankruptcy.

On June 13, 2005, Kavanagh filed a claim against the estate for unpaid legal fees in the Superior Court of Arizona, Maricopa County.

In July 2005, L&R began investigating the circumstances surrounding the lapse of the life insurance, including Northern Trust's involvement.  However, L&R quickly determined that a

claim against Northern Trust would not be viable when on August 4, 2005, the attorney for the trustee of F&G's bankruptcy estate informed George Paul (Paul), an L&R attorney and coexecutors' counsel in this case, that Northern Trust had decided against reinstating or transferring the life insurance because the tax consequences of doing so would be "detrimental and uneconomical". On the basis of that information, L&R concluded that a claim against Northern Trust would be unsuccessful because Northern Trust had a justifiable reason for allowing the life insurance to lapse.

On August 12, 2005, a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, was filed on behalf of the estate.  On Schedule F, Other Miscellaneous Property Not Reportable Under Any Other Schedule, of the return, the estate reported:

> THE DECEDENT WAS PREDECEASED BY HER SPOUSE, THOMAS S. FOSTER.  UPON MR. FOSTER'S DEATH ON JULY 11, 1996, THREE MARITAL TRUSTS WERE FORMED UNDER THE THOMAS S. FOSTER REVOCABLE TRUST DATED APRIL 15, 1994 * * *. UNDER INTERNAL REVENUE CODE SECTION * * * [2056(b)(7)], THE ASSETS OF ALL THREE MARITAL TRUSTS ARE INCLUDIBLE IN THE ESTATE OF THE DECEDENT. * * *

The estate reported the following as assets of Marital Trust #1 at the values set forth below:

| | |
|---|---|
| Cash | $12,862 |
| Publicly traded securities | 972,722 |
| Accrued dividend on securities | 969 |

The estate reported the following as assets of Marital Trust #2 at the values set forth below:

| | |
|---|---|
| Cash | $362,418 |
| Publicly traded bonds | 33,891,338 |
| Accrued interest on bonds | 515,367 |
| Federal home loan bond | 1,000,000 |
| Shares of Foster & Gallagher, Inc. | - 0 - |

The estate reported the following as assets of Marital Trust #3 at the values set forth below:

| | |
|---|---|
| Cash | $781,814 |
| Publicly traded bonds | 5,122,019 |
| Accrued interest on bonds | 73,645 |
| Publicly traded securities | 6,784,708 |
| Accrued dividend on securities | 6,190 |
| Partnership interests in real estate funds | 1,086,000 |
| Shares of Foster & Gallagher, Inc. | - 0 - |

The estate also listed on Schedule F a "LIABILITY RELATED TO LITIGATION AGAINST THOMAS S. FOSTER MARITAL TRUST" for each of the Marital Trusts. The estate reported the value of these "liabilities" as negative $286,100 for Marital Trust #1, negative $10,373,046 for Marital Trust #2 and negative $4,017,769 for Marital Trust #3 (collectively, the Marital Trust discount) based on an appraisal performed by Lynton Kotzin (Kotzin), vice president of Ringel Kotzin Valuation Services, on July 22, 2005. Kotzin's appraisal report (which was attached to the return) determined a 29-percent Marital Trust discount attributable solely to the hazards of litigation presented by the Keach lawsuit. The estate did not report any potential claims against Kavanagh or Northern Trust as assets of the estate.

By August 30, 2005, the only claim against Northern Trust being investigated by L&R was for negligently managing the Marital Trusts. Paul, however, believed this claim to be "weak and speculative." He concluded that "Unless something jumps out at us, it does not appear to be as economical an investment as the * * * [claims] against Kavanagh."

On September 6, 2005, coexecutors, individually and as coexecutors of the estate, filed a counterclaim against Kavanagh alleging that it had committed legal malpractice while drafting decedent's will and breach of fiduciary duty while representing decedent in the Keach lawsuit. Coexecutors obtained a subpoena for Northern Trust's records of its administration of the Marital Trusts and its loans to F&G and to decedent.

In October 2005, Robert McKirgan (McKirgan) joined the L&R team investigating the estate's claims against Kavanagh and Northern Trust. McKirgan reexamined the encumbrance of the life insurance but believed the estate did not have a viable claim against Northern Trust because: (1) There were not enough facts about what Northern Trust had or had not done; (2) decedent apparently knew about and gave her informed consent to the encumbrance of the life insurance; and (3) Mr. Foster had waived Northern Trust's conflict of interest by allowing Northern Trust to remain successor co-trustee of the Marital Trusts after it had become a creditor of F&G.

L&R was finally able to assemble the estate's claims against Northern Trust when on November 16, 2005, Northern Trust produced a memorandum (the memorandum) which L&R believed suggested that Northern Trust had been concerned only with justifying the encumbrance of the life insurance and had ignored its duty to investigate the merits of the transaction and advise decedent as to what rights she was surrendering. The memorandum also helped L&R identify which of the documents that were already in the estate's possession were essential to proving the estate's claims.

On July 28, 2006, coexecutors met with Kavanagh and Northern Trust to present the estate's claims against them regarding the 1999 transactions. At this point, the claims were based on the theory that Northern Trust and Kavanagh failed to advise decedent to obtain independent legal and financial advice for the 1999 transactions. On August 23, 2006, coexecutors offered to settle the estate's claims against Northern Trust and Kavanagh concerning the 1999 transactions for $19 million. On September 28, 2006, Northern Trust rejected coexecutors' offer and claimed it would be entitled to attorney's fees because the estate's claims were "completely without merit".

On October 27, 2006, coexecutors filed an amended counterclaim which sought joinder of Northern Trust as an additional defendant. In the amended counterclaim, coexecutors

alleged, among other things, that Northern Trust had breached its fiduciary duty as trustee of the Marital Trusts when it (1) engaged in self-dealing by allowing decedent to give up her rights to the life insurance in order to improve its position from unsecured to secured creditor of F&G (the Life Insurance Claim) and (2) facilitated decedent's withdrawal of assets from Marital Trust #3 to overcollateralize the loan it made to decedent in connection with the Founder's Loan (the Founder's Loan Claim). The estate sought compensatory damages, punitive damages, emotional distress damages, disgorgement of Northern Trust's and Kavanagh's fees, prejudgment interest, reimbursement of costs, and reasonable legal fees.

In 2007, coexecutors, Kavanagh, and Northern Trust engaged in court-ordered mediation. Northern Trust offered to settle the case for $250,000, but coexecutors rejected that offer.

On or about January 29, 2007, the estate's tax return was selected for examination. On May 24, 2007, coexecutors informed the Internal Revenue Service (IRS) of a potential additional asset of the estate. The asset, consisting of the claims held by the estate against Kavanagh and Northern Trust, was appraised on September 25, 2007, by Philip M. Schwab (Schwab), senior vice president of FMV Valuation & Financial Advisory Services. L&R provided the IRS with Schwab's appraisal report on September 27, 2007.

On March 28, 2008, coexecutors settled the estate's claims against Kavanagh for approximately $850,000 (Kavanagh's $1 million insurance limit minus litigation costs of approximately $150,000).

On April 24, 2008, the IRS sent the estate a notice of deficiency determining a deficiency of $4,749,722. The notice stated:

> The * * * [Marital Trust discount has] been disallowed as the amounts are not "sums certain" and "legally enforceable" at death. Estate of Van Horne v. Commissioner, 83-2 USTC (CCH) 13,548, [720] F.2d 1114, 1116 (9th Cir. 1983) and Propstra v. United States, 680 F.2d 1248, 1254 (9th Cir. 1982).

> Alternatively, the * * * [Marital Trust discount has] been disallowed as vague and uncertain estimates that are not ascertainable with reasonable certainty. IRC § 2053(a)(3) and Treas. Reg. § 20.2053-1(b)(3).

The notice did not determine a deficiency with respect to the estate's claims against Kavanagh and Northern Trust or disallow attorney's fees claimed to date as deductions with respect to administering the estate. On July 8, 2008, a timely petition was filed.

In April 2008, coexecutors filed a motion to compel in the State court action which led to the production of hundreds of documents that Northern Trust had claimed were privileged. L&R believed these documents suggested that Northern Trust's legal department had concealed from its own trust department the fact that Northern Trust's lending department had deliberately

disregarded Northern Trust's conflict of interest arising from its roles as co-trustee of the Marital Trusts and creditor of F&G and decedent.

The trial of the estate's claims against Northern Trust began on October 22, 2008. On October 24, 2008, coexecutors settled the estate's claims against Northern Trust for $17 million plus the return of previously withheld trust funds.

On July 21, 2009, respondent filed an amended answer asserting an increased deficiency of $14,637,722 attributable to the estate's claims against Kavanagh and Northern Trust, which respondent valued in the amended answer at $20.6 million. No adjustments were requested regarding attorney's fees claimed as deductions.

## OPINION

The valuation issues in this case, as discussed below, are to be decided as of the date of decedent's death, May 15, 2004. Differences between the parties focus in large part on the reasonableness of the valuation positions of the parties in appraising likely resolutions of litigation after the date of death. Before discussing the applicable legal principles, it is useful, therefore, to repeat the chronology of events relevant to the valuation issues. The important dates are:

Regarding Keach Lawsuit

Mar. 5, 2003          Summary judgment in favor of decedent as
                      executrix of Mr. Foster's estate

Feb. 12, 2004         District Court finding in favor of defendants

Mar. 8, 2004          Judgment in favor of defendants

Apr. 9, 2004          Appeal filed

Sept. 27, 2004        Release of claims against the estate

Aug. 17, 2005         District Court judgment affirmed


Regarding Claims Held by the Estate

Sept. 22, 2004        Decedent's counsel investigated and
                      identified potential claims against Kavanagh

June 13, 2005         Kavanaugh suit for unpaid legal fees filed

Aug. 12, 2005         Estate tax return filed without mention of
                      claim against Kavanagh or Northern Trust

Sept. 6, 2005         Counterclaim for malpractice and breach of
                      fiduciary duty against Kavanagh

Oct. 27, 2006         Amended counterclaim sought joinder of
                      Northern Trust as a defendant

Mar. 28, 2008         Kavanagh agreed to pay approximately $850,000
                      in settlement of estate's claims

Oct. 24, 2008         Northern Trust agreed to pay $17 million in
                      settlement of estate's claim and to return
                      withheld trust funds


As a general rule, the Internal Revenue Code imposes a Federal tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a). The taxable estate, in turn, is defined as "the

value of the gross estate", less applicable deductions.  Sec.
2051.  Section 2031(a) specifies that the gross estate comprises
"all property, real or personal, tangible or intangible, wherever
situated", to the extent provided in sections 2033 through 2045.

Property is included in the gross estate at its fair market
value, which is "'the price at which the property would change
hands between a willing buyer and a willing seller, neither being
under any compulsion to buy or sell and both having reasonable
knowledge of relevant facts.'"  Estate of Newhouse v.
Commissioner, 94 T.C. 193, 217 (1990) (quoting sec. 20.2031-1(b),
Estate Tax Regs.).  The determination of fair market value is a
question of fact.  Id.

## I.  Value of Marital Trusts

As a preliminary matter, the parties disagree as to whether
the burden of proof has been shifted to respondent under section
7491(a).  The burden of proof is relevant only when there is
equal evidence on both sides:  "In a case where the standard of
proof is preponderance of the evidence and the preponderance of
the evidence favors one party, we may decide the case on the
weight of the evidence and not on an allocation of the burden of
proof."  Knudsen v. Commissioner, 131 T.C. 185, 185-189 (2008).

The parties agree on the unencumbered values of the assets
of the Marital Trusts.  The parties disagree as to whether the
estate is entitled to a Marital Trust discount consisting of (1)

a discount for the hazards of litigation and (2) discounts for lack of marketability and lack of control attributable to the freeze imposed by Northern Trust.  For purposes of trial, coexecutors hired David M. Eckstein (Eckstein), managing director of FMV Valuation & Financial Advisory Services, to reappraise the Marital Trust discount.  Eckstein determined the impaired value of the Marital Trusts to be $34,200,000 based on (1) a 12.9- to 17.2-percent discount for the hazards of litigation presented by the Keach lawsuit followed by (2) discounts of 4 percent for lack of control and 15 to 20 percent for lack of marketability attributable to the freeze imposed by Northern Trust.  Thus, coexecutors now claim a Marital Trust discount of approximately 32.4 percent.

A.  Hazards of Litigation

The estate contends that it is entitled to discount the values of the assets of the Marital Trusts because the ESOP plaintiffs sought to impose a constructive trust over those assets.  The estate cites cases which it argues held that litigation (or the threat of litigation) concerning an asset in the gross estate justified discounting the value of the asset for estate tax purposes:  Am. Natl. Bank & Trust Co. v. United States, 594 F.2d 1141 (7th Cir. 1979), Estate of Newhouse v. Commissioner, supra at 218, Estate of Curry v. Commissioner, 74 T.C. 540 (1980), Estate of Sharp v. Commissioner, T.C. Memo.

1994-636, <u>Estate of Lennon v. Commissioner</u>, T.C. Memo. 1991-360, <u>Estate of Henderson v. Commissioner</u>, T.C. Memo. 1989-79, <u>Estate of Crossmore v. Commissioner</u>, T.C. Memo. 1988-494, and <u>Estate of Cobb v. Commissioner</u>, T.C. Memo. 1982-571.

The cited cases are distinguishable, however, because they involved litigation that could have affected the rights of a purchaser of the asset that was the subject of the litigation. A willing buyer in such a situation would have refused to pay full fair market value in light of the possibility that the buyer's rights in the asset could have subsequently been impaired.

In contrast, a willing buyer would not have insisted on a discount on the assets of the Marital Trusts because the Keach lawsuit could not have affected a buyer's rights. See <u>Estate of Kahn v. Commissioner</u>, 125 T.C. 227, 241 (2005). Moreover, the District Court entered its amended judgment in decedent's favor on April 23, 2004. "Upon a final judgment or decree, a party must seek a stay of judgment pending appeal to protect its interest in the underlying property." <u>Duncan v. Farm Credit Bank of St. Louis</u>, 940 F.2d 1099, 1102 (7th Cir. 1991). The ESOP plaintiffs did not do so. While rule 62(a) of the Federal Rules of Civil Procedure as in effect at the relevant time provides for an automatic 10-day stay of the judgment, that automatic stay expired before decedent's death. Since the ESOP plaintiffs did not thereafter seek a stay under rule 62(d) of the Federal Rules

of Civil Procedure, the assets of the Marital Trusts could have been transferred at decedent's death free and clear of the ESOP plaintiffs' claim for a constructive trust.

The estate contends alternatively, that if the Keach lawsuit is not an impairment to the value of the estate under sections 2031 and 2033, then the Keach lawsuit instead constitutes a claim against the estate entitling the estate to a deduction under section 2053.

Section 2053(a) allows a deduction for claims against the estate that are allowable by the laws of the jurisdiction under which the estate is administered.  Section 20.2053-1(b)(3), Estate Tax Regs., as in effect for the date of death of decedent provided:

> An item may be entered on the return for deduction
> though its exact amount is not then known, provided it
> is ascertainable with reasonable certainty, and will be
> paid.  No deduction may be taken upon the basis of a
> vague or uncertain estimate. * * *

Section 20.2053-4, Estate Tax Regs., provided:

> The amounts that may be deducted as claims against a
> decedent's estate are such only as represent personal
> obligations of the decedent existing at the time of his
> death, whether or not then matured, and interest
> thereon which had accrued at the time of death. * * *
> Only claims enforceable against the decedent's estate
> may be deducted. * * *

Our decision in this case is appealable to the Court of Appeals for the Ninth Circuit, and thus respondent relies on

Propstra v. United States, 680 F.2d 1248, 1253 (9th Cir. 1982) (stating that "The law is clear that post-death events are relevant when computing the deduction to be taken for disputed or contingent claims" (citing section 20.2053-1(b)(3), Estate Tax Regs.)), and Estate of Van Horne v. Commissioner, 78 T.C. 728, 735 (1982) (in which we concluded that we consider postdeath events in cases where the decedent's creditor has only a potential, unmatured, contingent, or contested claim that requires further action before it becomes a fixed obligation of the estate, but not where a claim is valid and fully enforceable on the date of death), affd. 720 F.2d 1114 (9th Cir. 1983). See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971); see also Estate of Shapiro v. United States, 634 F.3d 1055 (9th Cir. 2011); Marshall Naify Revocable Trust v. United States, 106 AFTR 2d 2010-6236, 2010-2 USTC par. 60,603 (N.D. Cal. 2010) (discussing the precedential weight of Propstra) on appeal (9th Cir., Oct. 19, 2010). Respondent describes the combined effect of those cases as holding "in the case of a contingent claim, which is not certain and enforceable at the decedent's death, post-death events (such as a subsequent settlement) should be taken into account." The estate discounts the Propstra rationale as dicta.

In Estate of Saunders v. Commissioner, 136 T.C. ___ (2011) (slip op. at 20-23), we observed that courts appear to disagree

on the extent to which events subsequent to the date of death may be considered in determining the deductibility of a claim under section 2053:  the Courts of Appeals for the Eighth and Ninth Circuits have directed that postdeath events be considered whereas the Courts of Appeals for the Fifth and Tenth Circuits have directed that postdeath events should not be considered. See Estate of McMorris v. Commissioner, 243 F.3d 1254 (10th Cir. 2001), revg. T.C. Memo. 1999-82; Estate of Smith v. Commissioner, 198 F.3d 515 (5th Cir. 1999), revg. on this issue 108 T.C. 412 (1997); Estate of Sachs v. Commissioner, 856 F.2d 1158, 1160-1163 (8th Cir. 1988), affg. in part and revg. in part 88 T.C. 769 (1987); Propstra v. United States, supra.  We declined to attempt to reconcile these cases and did not consider the effect of a post-death settlement of a claim against the taxpayer-estate because we instead found that the value of the claim was not ascertainable with reasonable certainty on the valuation date. The taxpayer-estate had suggested several values for the claim, and we considered the great differences in valuations to be a prima facie indication of the lack of reasonable certainty.  We noted that the estate's experts did not and could not reasonably opine that any of the suggested amounts would be paid, as required by the applicable regulation.  We concluded that stating and supporting a value is not equivalent to ascertaining a value with reasonable certainty.

Here, respondent alternatively determined in the notice of deficiency that the value of the Marital Trust discount was not ascertainable with reasonable certainty, and the estate has also suggested inconsistent values that indicate a lack of reasonable certainty. Kotzin, in the appraisal report included with the return, determined a 29-percent discount for the hazards of litigation presented by the Keach lawsuit. In the appraisal report prepared for the trial of this case, however, Eckstein determined only a 12.9- to 17.2-percent discount. The estate's experts thus differed on the effect of the Keach lawsuit by up to $8.1 million. In addition, Kotzin altogether failed to evaluate the lack of marketability and lack of control purportedly created by the freeze. The sharp discrepancy in their figures evidences a lack of reasonable certainty in the values they suggested. Like the taxpayer's experts in Estate of Saunders v. Commissioner, supra, neither Kotzin nor Eckstein opined or could reasonably opine that the amounts they suggested would be paid by the estate. Indeed, at the date of death the Keach lawsuit had been decided in favor of the defendants, although an appeal was pending. The estate has therefore failed to establish the value of the Marital Trust discount with reasonable certainty, as required by the applicable regulation.

Thus, the estate is not entitled to a discount or a section 2053 deduction in connection with the Keach lawsuit.

B.  Lack of Marketability and Control

The estate contends that it is entitled to lack of marketability and lack of control discounts on the assets of the Marital Trusts on account of the freeze placed on Marital Trust #3 by Northern Trust.

We agree with respondent, however, that the estate is not entitled to discounts on the assets of the Marital Trusts.  There is no basis for discounts on the assets of Marital Trusts #1 and #2 because the freeze was imposed only on Marital Trust #3. Furthermore, the estate is not entitled to discounts on the assets of Marital Trust #3 because the restrictions applied only to decedent, not the underlying assets of the trust themselves. When determining the value of a trust for estate tax purposes, we determine the value of the underlying assets in a hypothetical sale to a willing buyer.  Estate of Kahn v. Commissioner, 125 T.C. 227 (2005); see also Rev. Rul. 2008-35, 2008-2 C.B. 116. That the freeze may have prevented decedent from selling any of the assets of Marital Trust #3 does not affect the value of those assets; we must assume that such a sale would take place even if it could not actually occur.  Shackleford v. United States, 262 F.3d 1028 (9th Cir. 2001); Bank of Cal., N.A. v. Commissioner, 133 F.2d 428, 433 (9th Cir. 1943), affg. in part and revg. in part Estate of Barneson v. Commissioner, a Memorandum Opinion of the Board of Tax Appeals dated May 27, 1941.  Moreover, the

"freeze" was loosely enforced, and trust assets were in fact sold at undiscounted prices. Thus, no discount is appropriate because once a hypothetical buyer purchased the assets, he or she would be unaffected by the freeze and would be able to resell the assets at an undiscounted price.

Accordingly, the estate is not entitled to a discount for lack of marketability or for lack of control.

## II. Claims Held by the Estate

The estate held choses in action consisting of its claims against Northern Trust and Kavanagh. The estate concedes it improperly failed to report the choses in action as assets of the estate but disputes respondent's valuations.

Section 2031(a) provides that the value of a decedent's gross estate shall include "the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." For purposes of determining the value of the gross estate, the term "property" encompasses choses in action. See generally Estate of Curry v. Commissioner, 74 T.C. at 545-546. The contingent nature of a claim bears on the question of its value, not on its includability in the value of the gross estate. Id.

During trial we received reports and testimony from expert witnesses. We evaluate the opinions of the experts based on the qualifications and reasoning of each expert and on all other

credible evidence in the record. See Estate of Jones v. Commissioner, 116 T.C. 121, 131 (2001). We are not bound by the expert opinions, and we may determine a value based on our own examination of the record. It is the responsibility of the parties to instruct the experts on all the relevant facts that might affect the valuation. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). If the parties fail to provide the experts with complete information concerning material facts or reasonable assumptions to be made, the reliability of the experts is undermined. In the context of valuation cases, we have observed that experts may lose their usefulness and credibility when they merely become advocates for the position argued by a party. See, e.g., Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

Respondent did not raise the issue of choses in action in the notice of deficiency. Respondent raised it as a new matter in the amended answer. Accordingly, respondent bears the burden of proof on this issue. See Rule 142(a).

Respondent provided evidence as to the value of the claims against Northern Trust but failed to provide any evidence of the value of the claims against Kavanagh. Respondent submitted the expert reports and testimony of Mark L. Mitchell (Mitchell) and Mark E. House (House) regarding the value of the Life Insurance Claim and the Founder's Loan Claim. Mitchell's report explicitly states that "No analysis is provided of claims against Kavanagh

or others." Respondent therefore has failed to carry his burden of proof as to any claims against Kavanagh.

Respondent relies on the reports of House and Mitchell and Mitchell's conclusion that the fair market value of the Life Insurance Claim was $4,600,000 and the fair market value of the Founders Loan Claim was $500,000, for a total valuation of the claims against Northern Trust of $5,100,000 as of the date of death. These values, however, rise or fall on House's position that a hypothetical purchaser of the claims would have

> knowledge of all relevant facts that are reasonably known. And these facts were reasonably known. And yes, I mean I appreciate the fact that these guys put together a huge jigsaw puzzle. But all of those pieces were known even if they didn't understand the legal theories on how to put them together.

In his report, he assumes that the hypothetical purchaser would have knowledge of all of the facts in Northern Trust's files, including specifically those discovered by the estate's counsel after time-consuming and contested discovery. We agree with the estate's characterization of respondent's theory:

> that any fact known or document possessed by any of the relevant witnesses on date of death -- even if in the possession of concealing parties like Northern Trust or * * * [Kavanagh] -- should be imputed to hypothetical actors on date of death. In essence, they become omniscient of all relevant material.

Using House's analysis, Mitchell values the claims as they ultimately were refined over 2 years after the date of death with a 50-percent probability of success. Respondent's experts,

however, ignore the intervening expenditures of time and money investigating those claims in order to reach that level of knowledge and assume that it was all "knowable" on May 15, 2004, over 2 years before the claims were actually discovered by the estate's counsel.

Respondent argues that Mitchell's use of a 50-percent-likelihood-of-success assumption in his calculations is "conservative" and favors the estate because the estate's expert used a 75-percent likelihood of success in his calculations. That percentage, however, was the final number in the analysis of possible outcomes and assumed that the litigation had proceeded beyond various stages during which it might have been abandoned or concluded without any recovery to the estate.

The estate's valuation expert, Schwab, relied entirely on information provided by McKirgan and Paul. The estate's expert valued the potential claims that were reasonably known and under consideration at the date of death, specifically: (1) "The possibility of seeking damages from the misdiagnosis of * * * [decedent's] medical condition", (2) "the possibility of pursuing redress against the lack of a hedge or other financial instrument protecting the wealth of * * * [decedent] and her family from failure of * * * [F&G]" (Financial Hedge Claim), (3) "the possibility that the Kavanaugh [sic] law firm may have submitted excessive billings related to the Keach litigation", and (4) "the

investigation and correction of any accounting errors related to M[r]s. Foster's business partnership with Mel Regal".

The estate's expert concluded that only the "Financial Hedge Claim" had a positive value, found to be $43,474 before a 25-percent marketability discount, leading to a final value of $33,000. If this relatively minimal value had been placed on the claims by the estate's lawyers as of the date of death, however, we do not believe that they would have pursued the claims. On the contrary, we believe that at the date of death the estate's lawyers, as evidenced by their pursuit of the claims against Kavanagh within a reasonable time after decedent's death, had reason to believe that the claims had substantial value. Therefore, we reject Schwab's conclusion as a reasonable estimate of the value at which the claims would have been relinquished by the hypothetical seller to a hypothetical buyer.

We are left with the conviction that neither side's experts in this case have provided an objective and reliable conclusion and that they have each have engaged in "an overzealous effort * * * to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise". Messing v. Commissioner, 48 T.C. 502, 512 (1967).

Schwab's calculations assume a 99-percent probability of abandonment of the claim after a preliminary investigation and an 80-percent probability of abandonment after a comprehensive

investigation.  We believe that these assumptions are not reasonable and that the estate would not have proceeded past the preliminary investigation stage if the chances of a favorable outcome were less than 10 percent and would not have proceeded past the comprehensive investigation stage if the chances of a favorable outcome were less than 50 percent.  By the time coexecutors filed the amended complaint on October 27, 2006, Northern Trust had refused to pay anything in relation to the estate's claims and had claimed that it would be entitled to attorney's fees if the litigation were pursued.  Nonetheless, the estate decided to pursue the claim and to invest the additional resources necessary.  At this point, Schwab incorporates a 75-percent probability of success in his analysis.  On consideration of the methodology used by both valuation experts and adjusting Schwab's calculations to reflect (1) a 10-percent probability of a successful preliminary investigation (instead of 1 percent), (2) a 50-percent probability of a successful comprehensive investigation (instead of 20 percent), (3) a 39.5-percent lack of marketability discount (as determined by Mitchell), and (4) zero estimated litigation costs (since, as discussed below, the estate has claimed the actual costs of litigating its claims against Kavanagh and Northern Trust), we arrive at our conclusion that the fair market value of the claims against Northern Trust at the date of death was $930,000.

III.  The Estate's Actual Litigation Expenses

Section 2053 allows a deduction from the value of the gross estate for administration expenses.  Sec. 2053(a)(2). Administration expenses include attorney's fees.  Sec. 20.2053-3(a), Estate Tax Regs.

Respondent does not dispute that the expenses actually incurred by the estate in litigating the claims against Northern Trust and Kavanagh qualify as administration expenses within the meaning of section 2053 and the regulations thereunder. Respondent argues only that the estate should not be entitled to deduct these expenses if the estimated cost of that litigation has already been factored into the valuation of the choses in action.  Because we have not done so, there is no disagreement as to the estate's entitlement to deduct these administration expenses.

Accordingly, the estate is entitled to deduct its actual litigation expenses under section 2053.  We have considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.